[Crim. No. 3630. Third Dist. June 15, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR JOR-DAN PARKER, Defendant and Appellant.

Robert Carl Anderson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—Defendant Oscar Jordan Parker was indicted for theft by false pretenses and, by a separate indictment, on four counts of theft by embezzlement. This appeal is a sequel to his trial and conviction on the latter indictment.

Originally, trial on both indictments had been set for March 4, 1964, and assigned to a single trial department of the Sacramento superior court on the assumption, apparently shared by the prosecution and defense counsel, that the two cases would be consolidated for trial. There had been no order of consolidation, however. On the morning of the appointed day, the trial judge examined the files, noted that the indictments involved unrelated offenses and declined to permit consolidation. He directed that defendant be tried on the false pretense charge first and that his separate trial on the embezzlement charges would commence immediately thereafter.

On March 10, 1964, a jury found defendant guilty of the false pretense charge.[1] The next morning, at the opening of the trial for embezzlement, defense counsel moved orally for a continuance. His motion was expressed as follows: "At this time, your Honor, on behalf of Mr. Parker, the defendant in the case, I move for a postponement of the trial date on these grounds: that following his conviction in this court late last night, there has been a deluge of publicity given to the fact of his conviction. Publicity has appeared in prominence in the newspapers, television and radio, and that to commence

---

[1]Defendant's judgment of conviction of theft by false pretenses was affirmed by this court in *People* v. *Parker*, 3 Crim. 3629, filed June 15, 1965, and reported in *ante*, p. 86 [44 Cal.Rptr. 900].

this trial in the shadow of all of that publicity, when the fact of his conviction is of almost county-wide—a matter of county-wide discussion, that it cannot help but leave this impact upon any jury which would be selected so soon after that trial, and my motion is predicated upon the interests of justice, that the interests of justice would be best served by permitting some time to dissipate the completeness of impact upon the community as a whole.''

In response to the motion, the trial court stated that both parties had been ready to proceed on the date originally set, that defendant had received newspaper publicity preceding and throughout the first trial, that the publicity's effect upon the forthcoming trial could be investigated by means of the *voir dire* examination of prospective jurors and that the motion would be denied ''at this time.''

The jury panel consisted of 36 persons, 25 of whom were called to the jury box and questioned as to their qualifications and state of mind. Twenty of the 25 indicated some acquaintance with publicity concerning Mr. Parker. Several of the 20 had only ''glanced'' at the headings of the published news stories. Others said that they had ''scanned'' the newspaper articles, which they regarded as routine items of no more than casual interest. Two panel members who indicated a deeper interest in the case were excused by the court for cause. Each side had 10 peremptory challenges available to it. (Pen. Code, § 1070.) Each side exercised 5 of its 10 available peremptory challenges. After exercise of these challenges both the prosecutor and defense counsel ''passed'' the 12 jurors seated in the jury box. At that point an alternate juror was selected. Nine of the 12 jurors ultimately chosen, as well as the alternate juror, had indicated some prior contact with publicity concerning Parker but, in response to questioning by either the prosecutor or defense counsel, stated that they had no opinions regarding the defendant and were willing to judge the question of guilt or innocence according to the evidence and the judge's instructions. Of the other three jurors, two stated that they had read or heard nothing of defendant and one was not asked. The alternate juror did not participate in the verdict.

Penal Code section 1050 provides that no continuance of a criminal trial shall be granted ''except upon affirmative proof in open court . . . that the ends of justice require a continuance.'' ▪ Grant of a continuance is largely committed to the discretion of the trial court, whose action will

104

be disturbed on appeal only if discretion has been abused. (*People* v. *Justice,* 211 Cal.App.2d 660, 665 [27 Cal.Rptr. 465] ; Witkin, Cal. Criminal Procedure (1963) Trial, § 278, p. 270.)

█ Defendant's objection to trial hard upon the heels of unfavorable publicity evokes a problem of widespread interest. The frequently conflicting demands of fair trial and free news dissemination are currently the subject of soul-searching by the judiciary, the organized bar and the responsible publishers and broadcasters.[2] A salient phase of the problem is assurance of fair trial by an impartial jury selected in a community atmosphere which may have been preheated by unfavorable pretrial publicity. The problem is not really acute here, hence we resist the temptation to pile the Pelion of our own musings upon the Ossa of existing commentary.

Defendant's trial counsel did not support his continuance request with copies of newspaper stories or with affidavits describing television or radio broadcasts. Absence of the "affirmative proof" called for by Penal Code section 1050 severely limits appellate review of the discretionary action of the trial judge, who was himself able to absorb directly, understand and act in relationship to the public climate in which the actual events were transpiring.

Nevertheless the review limitations imposed by the record should not deter us from considering such factors as are available. Two California decisions of yesteryear, exhibiting perhaps a blunter approach than current decisions, simply assume that lack of difficulty in jury impanelment blots out the possible prejudice of pretrial publicity. (*People* v. *Buck,* 151 Cal. 667, 672 [91 P. 529] ; *People* v. *Ciulla,* 44 Cal.App. 719, 724 [187 P. 46] ; see Note, Hostile Sentiment or Preju-

[2]See *Estes* v. *Texas,* 381 U.S. 532 [85 S.Ct. 1628, 14 L.Ed.2d 543], filed June 7, 1965; Lumbard, *The Administration of Criminal Justice: Some Problems and Their Solution* (Sept. 1964) 49 A.B.A.J. 840, 844-845; Wright, *A Judge's View: The News Media and Criminal Justice* (Dec. 1964) 50 A.B.A.J. 1125; Daly, *Ensuring Fair Trials and a Free Press: A Task for the Press and the Bar Alike* (Nov. 1964) 50 A.B.A.J. 1037; Gelb, *Fair Trials and Free Speech,* 31 Geo. Wash.L. Rev. 607, 614-619; Mueller, *Problems Posed by Publicity to Crime and Criminal Proceedings,* 110 U.Pa.L.Rev. 1, 10-12; Goldfarb, *Public Information, Criminal Trials and The Cause Celebre,* 36 N.Y.U.L.Rev. 810, 818-824; Comment, *The Case Against Trial by Newspaper: Analysis and Proposal,* 57 Nw.U.L.Rev. 217, 220-226; *Free Press* v. *Fair Trial* (Nov. 1964), 41 N.D.L.Rev., Stanton, *The Broadcaster's View* (p. 7), Meyer, *The Judge's View,* (p. 14); *Free Press* v. *Free Trial: A Continuing Dialogue*—Gillmor, *'Trial by Newspaper' And the Social Sciences* (Jan. 1965) 41 N.D.L.Rev. 156; Barron, *A Constitutional Impasse?* 41 N.D.L. Rev. 178.

dice as Ground for Continuance of Criminal Trial, 39 A.L.R. 2d 1314.) It seems preferable to avoid doctrine at this point; to suggest, rather, an *ad hoc* approach guided by the simple but fundamental criterion of fair trial, in which "each case must turn on its special facts." (*Marshall* v. *United States,* 360 U.S. 310, 312 [79 S.Ct. 1171, 3 L.Ed.2d 1250].)

Without knowing what was actually published or broadcast, we do know that the central theme was Parker's conviction of grand theft on the day preceding jury impanelment. That theme alone would tend to arouse public suspicion and bias. It would acquaint prospective jurors with a fact not generally admissible in evidence, that is, the defendant's conviction of an unrelated crime. (See Witkin, Cal. Evidence (1958) § 135, p. 158.) On the other hand, the charges against Parker were not particularly "juicy." His were "economic" offenses, not crimes of lurid violence or rampant sexuality. Crimes of the latter kind attract vastly more attention and tend to excite more public hostility than the former. With rare exceptions, offenses of the economic variety arouse nothing more than the casual reaction described by the jury panel members in this case. Possibly the news value of such offenses is confined to relatively small segments of the reading, viewing and listening public. Outside these limited spheres of interest, the public attitude toward the accused is more apt to be one of indifference rather than prejudice. To all appearances, Parker's was no *cause celebre.* None of the jury panel members demonstrated more than a routine and casual interest in the publicity and all disavowed any preconceived attitude toward the defendant.

 California law evinces a policy permitting acceptance of jurors who, after contact with pretrial news reports, commit themselves to impartiality and fairness. (Pen. Code, § 1076; *People* v. *Duncan,* 53 Cal.2d 803, 812-816 [350 P.2d 103]; *People* v. *Daugherty,* 40 Cal.2d 876, 889-890 [256 P.2d 911].) Uncritical acceptance of professions of objectivity would be naive. Such professions must be weighed against the nature of the crime and the color and impact of the publicity. In relation to the charges against Parker and in the absence of a record of provocative publicity, we are not at all skeptical of the jurors' disavowals. It was easy to be quite cool about the entire matter. Parker's trial counsel left 5 of his 10 peremptory challenges unexercised. Notwithstanding the opportunity for renewal impliedly tendered when the trial judge denied the continuation request "at this time," he

did not renew his motion or object to continuing with the trial. These circumstances lead us to infer that he advisedly accepted the jury as an impartial arbiter of his client's fate.

We imply no criticism of Parker's trial counsel. Although his motion for continuance was not accompanied by "affirmative proof," he could have renewed the motion had he any real qualms as to the impartiality of the 12 jurors actually selected. We have carefully read the transcript of the impanelment proceeding. It must have convinced counsel, as it convinces us, that whatever the news stories actually said, they did not really create an emotional climate substantially impeding selection of an impartial jury. There was no abuse of discretion in rejection of the continuance request and no denial of a fair trial.

At defendant's trial the defense presented no testimony. Proceeding by the then current California rule, the prosecutor commented and the trial court instructed the jury on defendant's failure to take the stand to explain or deny the evidence against him.[3] Defendant's appeal brief assigns the comment and instruction as error. At the time of the trial the procedure was correct in the light of the existent state of the law. (See *Adamson* v. *California*, 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223]; *People* v. *Modesto*, 62 Cal.2d 436 [42 Cal.Rptr. 417, 398 P.2d 753].) On April 28, 1965, more than a year after defendant's trial and after this appeal had been briefed and argued, the federal Supreme Court filed its decision in *Griffin* v. *California*, 380 U.S. 609 [85 S.Ct. 1229, 14 L.Ed.2d 106]. The *Griffin* case holds that the California comment rule violates the Fifth Amendment[4] of the federal Constitution as the latter bears on the states via the Fourteenth Amendment. Accordingly, although the trial court action appeared proper when taken, it is now evident that the comment and the instruction violated one of the protections provided defendant by the concept of due process of law. Viewing this deprivation as an error of law in defendant's trial, we must now decide whether it requires or justifies reversal of the conviction.

Although in violation of a federal Constitution right,

[3] "No person shall . . . be compelled, in any criminal case, to be a witness against himself . . . but in any criminal case, whether the defendant testifies or not, his failure to explain or deny by his testimony any evidence or facts in the case against him may be commented upon by the court and by counsel, and may be considered by the court or the jury." (Cal. Const., art. I, § 13; see Pen. Code, § 1323.)

[4] "No person . . . shall be compelled in any criminal case to be a witness against himself, . . ." (U.S. Const., Fifth Amend.)

such an error is not reversible per se; rather, the rule of article VI, section 4½, of the California Constitution applies, permitting reversal only if the error resulted in a miscarriage of justice. (*People* v. *Bostick*, 62 Cal.2d 820 [44 Cal. Rptr. 649, 402 P.2d 529], filed June 3, 1965.) Thus, pursuing the usual rule on appeal, we examine the trial record to ascertain if there is a reasonable probability that the jury would have reached a result more favorable to defendant had the comment on his failure to testify been excluded. (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) Simultaneously, we shall consider defendant's argument that there is no substantial evidence to support the verdict of guilt.

Defendant Parker was a builder and residential subdivision developer. He conducted operations in his own name and through various corporations owned by him and his wife. His subdivision operations were subject to the provisions of the California subdivision law (Bus. & Prof. Code, §§ 11000 et seq.). That law requires subdividers to supply information to the Real Estate Commissioner and for the commissioner's issuance of a public report authorizing the sale of subdivision lots. (Bus. & Prof. Code, §§ 11010, 11018.) Before the execution of a contract for the sale of a subdivision lot, the subdivider or his agent must provide the customer with a copy of the commissioner's public report. (Bus. & Prof. Code, § 11018.1.) Sections 11013.2, subdivision (a) and 11013.4, subdivision (a) of the Business and Professions Code deal respectively with the sale or lease of subdivided lots subject to a blanket encumbrance and the sale or lease of lots not so encumbered. So far as pertinent to the present case, each declares it unlawful for an owner or subdivider to sell subdivision lots unless the purchaser's payment is deposited in an escrow depository or trust account acceptable to the commissioner.

Acting on information supplied by Parker or those in his employ, the Real Estate Commissioner issued public reports on several subdivisions operated by Parker. The statements filed with the commissioner represented that all moneys would be impounded in an escrow or trust account with a named title company. These statements were signed by Parker himself. The subdivisions were called Cresthaven, Madison Oaks Unit No. 2 and Meadow Oaks Unit No. 1. The public reports on the Cresthaven and Madison Oaks subdivisions contained a paragraph reading as follows: ''DEPOSIT MONEY HANDLING: The subdivider advises that all money will be impounded

in an escrow in accordance with Section 11013.2(a) of the Business and Professions Code.'' The public report on Meadow Oaks Unit No. 1 included a paragraph which was identical, except for a reference to Business and Professions Code section 11013.4, subdivision (a) rather than 11013.2, subdivision (a).

The four counts of the indictment involve transactions in which Parker's corporation, Parker Built Homes, entered into agreements to sell subdivision homes and receive downpayments from purchasers. Mr. and Mrs. Lawrence Higbee signed a contract to purchase a home in the Cresthaven subdivision and made a downpayment of $7,100 by a check which Higbee delivered to a salesman representing Parker Built Homes. Mr. and Mrs. Paul Ingham executed a purchase contract for a house in Madison Oaks Unit No. 2 and made a downpayment of $3,750 by a check delivered to Parker's office in Carmichael. Robert Wilson and Dimitrij Motal executed purchase contracts for homes in Meadow Oaks Unit No. 1. Wilson made a downpayment by a check of $5,500, which he delivered to an employee in Parker's office. Motal paid his money in the form of two checks, one for $100 which he delivered to a Parker salesman, the other for $452.48 which he delivered to Parker himself.

Before making his downpayment, each of the four purchasers received a copy of the Real Estate Commissioner's public report, with its statement that all money would be impounded in escrow. Motal was informed by Parker himself that his money was to be deposited with a title company. Actually, none of the money was deposited with a title company or paid into escrow. All these payments were deposited in the operating accounts of one or another of Parker's building firms and consumed in business expenses. Kenneth Gillanders, Parker's accountant-controller, testified that he worked under Parker's supervision, that the payments received from the purchasers were deposited under his direction, and that, after being deposited in the operating accounts of the Parker organization, these payments were carried on the books as liabilities owed to the purchasers. The indictment charges Parker with grand theft of the downpayments received from Higbee, Ingham, Wilson and Motal.

■ Theft by embezzlement is defined as the fraudulent appropriation of property by one to whom it has been entrusted. (Pen. Code, §§ 503, 506.) ■ The gist of the offense is the appropriation to the defendant's own use of

property delivered to him for a specified purpose other than his own enjoyment of it. (*People* v. *Woolson,* 181 Cal.App.2d 657, 667 [5 Cal.Rptr. 766]; *People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38].) ▮ Since possession of the property in some kind of fiduciary capacity is an essential element of the offense, one cannot be guilty of embezzling money when he has acquired title to it by contract or sale. (*People* v. *Holder,* 53 Cal.App. 45 [199 P. 832].)

Unlike unregulated sellers, Parker did not receive the customers' payments as his own. Although he now points out that the purchase contract forms signed by the customers had no impound provision, each customer, through the public report of the Real Estate Commissioner, was led to believe that the downpayment would be held intact in the hands of a neutral depository and not spent by the seller. The impound arrangement was part of the expectations and commitments surrounding the transaction, just as fully and completely as though Parker had personally signed and given each customer a written declaration of trust. ▮ The money was paid to him as an agent for the restricted purpose of delivery to a title company. In this role, he was the trustee not the owner of the money; its ownership remained in the buyers. (*People* v. *Clemmons,* 136 Cal.App.2d 529, 534 [288 P.2d 1021]; *People* v. *Braiker,* 61 Cal.App.2d 406, 411-412 [143 P.2d 89]; see also, *Vineland Homes, Inc.* v. *Barish,* 138 Cal. App.2d 747, 750 [292 P.2d 941].)

Defendant's accounting records showed that each purchaser was credited with the downpayment. Defendant urges that this circumstance effectively disproves any intent to defraud. He also points out that the four purchasers eventually acquired title to the houses and received credit for their downpayments.[5] ▮ The offense of embezzlement is complete when the agent or trustee diverts the trust money from the trust purpose; his intent to restore the money at some later time is of no avail. (*People* v. *Talbot,* 220 Cal. 3, 15-16 [28 P.2d 1057]; *People* v. *Braiker, supra,* 61 Cal.App.2d at p. 412; see Pen. Code, §§ 512, 513.) ▮ The central purpose of the impoundment intended by the subdivision law is to guard the integrity of the purchaser's downpayment pending delivery of title, assuring him something better than

[5]As a consequence of Parker's financial difficulties and the dissolution of the downpayment money, acquisition of title by Higbee and Ingham was delayed for 18 months. Wilson and Motal encountered a one-year delay.

the status and possible frustrations of an unsecured creditor. Use of the downpayments in Parker's business operations effectually destroyed this objective. That Parker's accounting records conceded the customers' status as his general creditors is not at all inconsistent with the existence of a fraudulent design to appropriate their money. The money was not his to use, but he used it anyway.

■■■ Proof of Parker's personal participation in the disposition of funds by his employees is circumstantial. He had personally signed assurances that purchasers' downpayments would be impounded. He knew that his employees were receiving such payments. He personally told one of the customers, Motal, that the money was going to a title company. Gillanders, the accountant-controller, testified that he worked under Parker's supervision and guidance. Use of the money for general business expenses was, at the minimum, in violation of commitments made in the subdivision questionnaires. It is not credible that Parker's subordinates would divert the money without directions from Parker himself. These circumstances convince us, as they apparently convinced the jury, that defendant personally ordered and participated in the misappropriation.

■■■ Fraudulent misappropriation is essentially a jury question; a factual review of the verdict ceases at the point where substantial supporting evidence appears. (*People* v. *Clemmons, supra,* 136 Cal.App.2d at p. 535.) ■■■ In our review of the evidence we have long since passed the point of satisfaction on the substantial evidence issue. On the miscarriage of justice issue, our review of the record establishes beyond any possibility of legitimate dispute that Parker did not appropriate the money under a good faith belief that he was entitled to do so. There is no conflict or inconsistency in the evidence. It is perfectly evident that defendant wrongfully took and used for his own purposes money which did not belong to him and which had been placed in his possession solely for transmission to a neutral depository. In ratio to the compelling evidence of guilt, the comment and the instruction (however unconstitutional) on defendant's resort to silence, are quite insignificant. There is no reasonable probability that absence of the comment and instruction would have resulted in acquittal. The comment and the instruction caused no miscarriage of justice.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.