Frank DeGoff and Ann DeGoff v. Commissioner.
De Goff v. Commissioner
Docket No. 2600-63.
United States Tax Court
T.C. Memo 1966-89; 1966 Tax Ct. Memo LEXIS 190; 25 T.C.M. (CCH) 492; T.C.M. (RIA) 66089; April 28, 1966
*190 1. Held, on the facts, that petitioner Frank DeGoff sustained a loss of $60,000 from the fraudulent misappropriation of said sum by a man named Ichelson to whom petitioner had delivered the same in trust for the sole purpose of having Ichelson invest it on petitioner's behalf. And further held that, as a matter of law, said misappropriation constituted an "embezzlement"; that petitioner's loss from such embezzlement is deemed to have been sustained by him in the year 1960 when Ichelson disappeared and the embezzlement was first discovered by petitioner; and that a deduction for petitioner's said embezzlement loss is allowable to him for said year 1960, under the provisions of section 165(a) and (c)(3) of the 1954 Code and section 1.165-8(a)(2) and (d) of the Income Tax Regulations.
2. Held, that respondent's determination that certain payments which petitioner received from Ichelson in the aggregate amounts of $3,000 in 1959 and $743 in 1960, constituted "interest income" to petitioner for the respective years in which the same were received, is approved by reason of petitioner's failure to establish error in said determination of the respondent. Lawrence A. Nestel, for the petitioners. Martin A. Schainbaum and Harry Morton Asch, for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: Respondent determined deficiencies in the income taxes of the petitioners for their taxable calendar years 1959 and 1960, in the *192 amounts of $980.76 and $2,940.67, respectively. The issues for decision are: (1) Whether petitioner Frank DeGoff is entitled to a deduction of $60,000 for the year 1960, for an alleged embezzlement loss. (2) Whether certain payments received by said petitioner in the amounts of $3,000 in 1959 and $743 in 1960, constitute interest income to him for said years. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and all exhibits identified therein are incorporated herein by reference. The petitioners, Frank DeGoff and Ann DeGoff, are husband and wife residing in Palm Springs, California. They filed a joint Federal income tax return for each of the years involved, with the district director of internal revenue at San Francisco. The issues here involved concern only the husband, Frank DeGoff, whom we will hereinafter refer to as "the petitioner." During the taxable years the petitioner was an elderly man who suffered from a heart condition, and who had retired from active business. For a period of about 25 years he had been acquainted with a man named Albert Ichelson who was active in handling various real estate transactions in the San Francisco *193 area; and since about 1944 petitioer had participated through Ichelson, as an investor in several of such transactions. Petitioner's practice in making these investments was to telephone Ichelson from his home; discuss various investment opportunities; and then send Ichelson a check for the amount that was to be invested by the latter on petitioner's behalf. By reason of petitioner's personal confidence in Ichelson, he relied almost entirely upon the latter's guidance; and he also entrusted him with the amounts to be invested, without receiving any formal documentation of their arrangement. In this matter, petitioner had for several years participated with Ichelson and members of the latter's family in several investments in the San Francisco area, including the purchase of an office building, a tavern, a motel and a hotel. One of the most profitable of these transactions was an investment, both by petitioner and by Ichelson, in the office building located at 130 Sutter Street, San Francisco. In 1954 and 1957, the above-mentioned Sutter Street office building was refinanced through a loan obtained from an insurance company. As the result, petitioner received in 1954 from his investment *194 in that building, a distribution of $45,000; and he then arranged with Ichelson to reinvest this amount for his benefit - as was actually done. Subsequently in November 1957, petitioner received an additional distribution of $85,000 as a result of the refinancing of the Sutter building; and Ichelson at the same time received a similar distribution in the amount of $170,000. Petitioner thereupon used $25,000 of the $85,000 distributed to him, to satisfy a mortgage on his home and for other personal purposes; and he then deposited the balance of $60,000 in his personal bank account and telephoned Ichelson for the latter's suggestions as to how this $60,000 might be reinvested. Ichelson's reply was: "Send it up [to me]. I always have deals going and I will put you in a couple of deals with me." Ichelson further suggested that petitioner write a check for use in transmitting the $60,000; that he write thereon the words "for INVESTMENTS"; and that no other documentation would be necessary to evidence the arrangement between them. Petitioner thereupon followed this suggestion and forwarded to Ichelson his personal check for $60,000 reading as follows: FRANK DeGOFF, 1415 So. Calle Marcus, *195 Palm Springs, California
Nov. 14 1957 No. 360 Pay to the order of Albert Ichelson SIXTY THOUSAND 00/100 DOLLARS $60,000 /s/ Frank DeGoff Head Office CROCKER-ANGLO NATIONAL BANK, 1 Sansome Street, San Francisco, California
(for INVESTMENTS) Ichelson upon receiving this check endorsed the same as payee; and he then deposited the proceeds thereof in his personal bank account. In making the above-mentioned arrangement, petitioner placed the call to Ichelson from the telephone in the kitchen of his home; and his wife, who was interested in her husband's investments, listened to the conversation on an extension phone. Petitioner at that time understood both from his prior telephone conversations and his prior investment dealings with Ichelson, that the latter always had large investments in prospect; and it was petitioner's intention when he forwarded the $60,000 check to Ichelson, that the latter would hold the same in trust solely for making a suitable investment on petitioner's behalf, in accordance with the above-mentioned notation on the face of the check. At this same time, petitioner also forwarded to Ichelson for purposes other than investment, a second check in the *196 amount of $5,000 which is not involved in this proceeding; and on this latter check, there was no notation to the effect that it was to be used for investments. Subsequent to forwarding the said $60,000 check to Ichelson, petitioner telephoned the latter every few weeks to inquire whether the amount thereof had been invested. Ichelson's replies were uniformly to the effect that he had several big deals pending; and that petitioner should "Just sit still" until these deals developed. During one of these later telephone conversations, Ichelson suggested that petitioner should liquidate a portion of his remaining investment in the Sutter building, so as to provide additional funds for investment through Ichelson in the latter's pending big deals; but petitioner declined to accept that suggestion. In the late spring or early summer of 1959, petitioner's nephew Sidney DeGoff, who was an attorney at law practicing in San Francisco, unexpectedly met Ichelson on the street in front of the Palace Hotel in San Francisco; and, knowing of his uncle's concern regarding the above-mentioned $60,000, Sidney inquired as to whether Ichelson had by that time invested said sum. Ichelson's reply to *197 this inquiry was in substance, that he planned to put petitioner's money into a shopping center investment; and that in the meantime, he was temporarily holding the money. A few months later in August 1959, petitioner requested Ichelson by telephone to return the $60,000; but Ichelson then again assured petitioner that a large investment transaction was pending. Prior to this latter conversation, Ichelson had filed statements of his financial condition with the Crocker-Anglo National Bank; and in each of these statements he had listed his assets and liabilities, without in any way indicating that the $60,000 which he had received from petitioner was a loan liability. On April 1, 1960, the San Francisco newspapers carried a headline to the effect that Albert Ichelson had disappeared. Petitioner upon reading this, became very much disturbed. He thereupon telephoned an accountant named Christopher Miller who for several years had been handling the income tax returns of both Ichelson and petitioner; and he inquired from Miller whether Ichelson's disappearance might affect the $60,000 investment in the shopping center, which Ichelson had indicated that he was making on petitioner's behalf. *198 Miller thereupon informed petitioner that while Ichelson had himself made an investment in the shopping center, none of petitioner's money had been invested therein Petitioner then, being still further disturbed, phoned his nephew Sidney DeGoff, who in turn communicated with accountant Miller. Sidney in this manner not only confirmed that Ichelson had made an investment for himself in the shopping center without making any investment therein on behalf of petitioner, but he also learned that Ichelson had, prior to his disappearance, transferred his said investment to his daughter. Sidney DeGoff, upon obtaining the above information, retained the services of an attorney named August Rothschild who specialized in bankruptcy matters. It was Rothschild's conclusion that in view of the situation at hand, an involuntary petition in bankruptcy should be filed immediately in respect of Ichelson, in the United States District Court in San Francisco. Because participation by three creditors was an essential prerequisite of the filing of such a petition, Rothschild arranged with the Wells Fargo Bank American Trust Company and also with the Crocker-Anglo National Bank to join with petitioner *199 in the filing of such bankruptcy petition. Petitioner at this time was residing in Palm Springs, and therefore he did not personally sign the petition; but instead, he authorized Sidney DeGoff to sign the same on his behalf. Sidney was not at that time familiar with the circumstances under which petitioner had delivered the $60,000 to Ichelson; but since he believed it to be essential that the bankruptcy petition be filed immediately, he for reasons of expediency, stated both in the bankruptcy petition and also in the subsequent proof of claim, that the nature of petitioner's claim against Ichelson was for $60,000 loaned. At about this same time in 1960, it was discovered that Ichelson had outstanding liabilities of approximately $750,000, and that he had assets of only nominal value. The result of the bankruptcy proceeding was that, about a year after the petition had been filed, the court ordered that, due to a waiver of discharge filed by Ichelson, he be not discharged in that proceeding. Ichelson, after receiving the above-mentioned $60,000 from petitioner in November 1957, used and lost all of the same in gambling and other personal matters. Petitioner however, did not obtain *200 knowledge of this misappropriation until the year 1960, when Ichelson disappeared and the above-mentioned bankruptcy petition was filed. No portion of petitioner's $60,000 was ever recovered by him, either through insurance or otherwise. During the year 1959 and the first part of 1960, petitioner received several checks from Ichelson in amounts of about $300 each; and the totals of these checks were $3,000 for the year 1959 and $743 for the year 1960. In prior years, petitioner had received similar checks from Ichelson; and in his income tax returns for those years, he had reported the amounts of said checks to be "interest income" - by reason of information to that effect which had been supplied to his accountant by Ichelson. However, after Ichelson's disappearance in 1960 (which was prior to petitioner's filing of his income tax returns for both 1959 and 1960), petitioner's accountant Miller suggested that the 1959 and 1960 payments from Ichelson might not request "interest income," but might be merely a return of portions of the misappropriated funds; and accordingly petitioner did not report any part of the same as "income" for the years 1959 and 1960. Petitioner did however, *201 in his 1960 return, claim a deduction for the $60,000 as an "embezzlement loss." The respondent in his notice of deficiency herein, disallowed petitioner's claimed deduction for the "embezzlement loss," on the ground that petitioner had not established that he was entitled to such a deduction; and respondent also determined that the above-mentioned payments from Ichelson in the said amounts of $3,000 and $743, constituted "interest income" to petitioner for the respective years in which the same had been received. Opinion Re Issue 1 1. In deciding this first issue, we are confronted at the outset, with several direct and irreconcilable conflicts between the testimony of Albert Ichelson on the one hand, and the testimony on the other hand of the petitioner, his wife Ann DeGoff, and his nephew Sidney DeGoff who is an attorney at law in San Francisco. Ichelson testified in part and in substance, that the transaction through which he obtained from petitioner the $60,000 here involved, was initiated by himself through a telephone call made to petitioner, in which he requested the latter to "loan" him said $60,000 for his own personal use; that petitioner had thereupon agreed to *202 such request, and had forwarded said $60,000 to him as a "loan," without any restriction or limitation on the manner in which he might personally use the same; that he did not see the notation on the $60,000 check, to the effect that it was to be used "for INVESTMENTS"; that he never saw or talked with Sidney DeGoff on the street in front of the Palace Hotel in San Francisco, and therefore had never told the latter that he intended to invest petitioner's said money in the shopping center transaction; and that, when he had dissipated petitioner's money in gambling and other personal matters, he had merely employed the same for his unrestricted personal use in a manner permitted under his arrangement with the petitioner. All of this testimony of Ichelson is directly contrary to the testimony of the other witnesses above mentioned. After carefully considering and weighing all testimony, exhibits and other evidence of record, and after having seen and heard all the witnesses testify and thereby observed their demeanor, we are firmly convinced that the above-mentioned testimony of Ichelson is untruthful and unworthy of belief, and should therefore be disregarded. Accordingly, we have *203 made our Findings of Fact herein on the basis of all the evidence other than the above-mentioned conflicting testimony of Ichelson. We therefore hold and find as ultimate facts, in accordance with the Findings of Fact which we have hereinabove made; (a) That the $60,000 which petitioner delivered to Ichelson by means of the check that bore the notation "for INVESTMENTS," was delivered to the latter in trust and solely for the restricted use of making investments on behalf of petitioner; (b) that Ichelson, in thereafter using and dissipating the same in gambling and other personal activities, breached his trust obligation to petitioner and fraudulently misappropriated the $60,000 which had been so entrusted to him; (c) that by reason of such breach of trust and misappropriation by Ichelson, petitioner incurred a total loss of said $60,000 in the year 1960, when he first discovered such misappropriation; and (d) that petitioner at no time recovered any portion of his said loss, either through insurance or otherwise. 2. We further conclude and hold, as a matter of law, that petitioner's said loss of the $60,000 constitutes a loss "from theft" within the meaning of section 165(c)(3) of the Internal Revenue Code *204 of 1954; and that petitioner is entitled to a deduction for the same, under section 165(a) of said Code, in the computation of his taxable income for the year 1960. The Income Tax Regulations specifically provide in section 1.165-8(d) thereof, that the term "theft" (as used in the above-cited statute), "shall be deemed to include * * * embezzlement * * *"; and these regulations further provide in section 1.165-8(a)(2) thereof, that "A loss arising from theft shall be treated under section 165(a) as sustained during the taxable year in which the taxpayer discovers the loss." Moreover in People v. Parker, Cal. App. 2d , 44 Cal. Rptr. 909, at 914 (being a decision of a court in the State of California - the state in which the present misappropriation occurred) the court said: Theft by embezzlement is defined as the fraudulent appropriation of property by one to whom it has been entrusted. (Pen. Code, secs. 503, 506.) The gist of the offense is the appropriation to the defendant's own use of property delivered to him for a specified purpose other than his own enjoyment of it. * * * To the same effect see People v. Steffner, 67 Cal. App. 23, 227 P. 699, at 702; *205 and People v. Corenevsky, 124 Cal. App. 2d 19, 267 P. 2d 1048, at 1050. It is not necessary that a formal trust be created in order to find that the property has been entrusted. Saul M. Weingarten, 38 T.C. 75, at 79. We decide this first issue in favor of the petitioner. Re Issue 2 The second issue herein pertains to the several $300 payments totaling $3,000 for the year 1959 and $743 for the year 1960, which the petitioner received from Ichelson. The respondent determined that these payments constituted "interest income" of petitioner for the respective years in which he received them. As shown in our Findings of Fact, petitioner had in prior years received similar payments from Ichelson, and had reported the same as "interest income," in his income tax returns for those prior years. However, after Ichelson's disappearance in 1960, petitioner was advised by his accountant Miller, that if the $60,000 had not been invested by Ichelson on petitioner's behalf, the payments could not represent interest income from an investment of that sum, and might represent merely remittances of portions of said $60,000. Accordingly petitioner did not report the same *206 in his 1959 and 1960 income tax returns. At the trial of the present case, petitioner did not adduce any evidence which tends to establish the true character of said payments; and although we agree that such payments can not represent interest income from the $60,000 here involved, it remains possible that they may represent interest income from other investments of petitioner which Ichelson was handling on petitioner's behalf. We therefore are impelled to conclude that petitioner has failed to establish error in the respondent's determination as to this second issue; and accordingly, we approve that determination. Decision will be entered under Rule 50.