[Crim. No. 4679.    Third Dist.    Aug. 20, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. RALPH LEROY McKEE et al., Defendants and Appellants.

Werner K. Zimmer, under appointment by the Court of Appeal, Paul J. Petrozzi and Marco S. Zarick for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Edsel W. Haws and John Fourt, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—A jury found defendants McKee, Waite and Richard Bennett guilty of felonious assault. McKee and Waite appeal from the judgments.

The prosecution established that two girls, Ernestine (Cookie) and Linda, as well as the three defendants, were in the Zombie Zula bar. At closing time, approximately 2 a.m., Cookie, followed by John Hunsaker, another patron, and Doug Pace, an employee, left the premises a little ahead of Linda and entered her Volkswagen, which was in the parking lot at the side of the building. Linda then came out followed by McKee, who was shouting obscenities at her. After replying in kind, Linda entered the Volkswagen but could not close the door because McKee was standing in the way. When Hunsaker told McKee to quiet down and move on, and Cookie told McKee that she did not want to hear any more of his filthy mouth, McKee started kicking the right side of the car.

At this point Dale Wilkins, proprietor of the Zombie Zula, came out. Seeing the commotion, he went over and told McKee to stop kicking the car. McKee asked Wilkins what he planned to do about it. Cookie got out to see whether McKee had damaged her car. When McKee started towards Cookie, saying, "I'll get you, bitch," Wilkins reached for McKee and ordered him to leave the girls alone. Both McKee and Waite, the latter just appearing, started towards Wilkins with their fists clenched. Wilkins backed up, stepped on a flower planter-

box, pulled out a pistol, told the girls to leave (which they did) and told McKee and Waite to get in their car and leave. Wilkins stepped off the planterbox and had just put his gun away when the two attacked him. Waite gouged Wilkins' eyes and wrested the gun after Wilkins pulled it out again. Wilkins broke away and started running toward his car. Nearing it, he heard the gun fired. Wilkins stopped and held up his hands, at which time Waite approached and pushed him, causing him to fall on his back. For a short time thereafter the two continued to strike or kick Wilkins. They then stopped. Wilkins got up again and started staggering toward the street when he was felled by a blow to his cheek by a beer can wielded by Bennett. The three defendants ran to their car and drove off.

The following day Waite took Wilkins' automatic to the home of Roland Brown, where it was disassembled and destroyed.

Defendants McKee and Waite admitted involvement, but explained that Wilkins had pulled the gun on them and that they had sought only to defend themselves and to disarm Wilkins. It is their claim that while McKee was kicking the car, Wilkins approached McKee with his gun drawn; that Waite grabbed Wilkins' arm and in the ensuing scuffle the gun discharged. During the time Wilkins and Waite were scuffling, Doug Pace attacked McKee, but upon hearing the gun go off, they both started running. In the meantime Wilkins broke away, started running, then again started towards Waite at which time Waite pushed Wilkins causing him to fall. Waite then left. Though Waite admitted pushing Wilkins, his testimony was that someone else whom he could not identify struck Wilkins after he was down. Waite denied gouging Wilkins' eyes or inflicting any injuries on him, and McKee denied striking anyone but Pace.

## Pretrial Newspaper Publicity

On July 27, 1967, a jury was impaneled to try the three defendants in the Sacramento Superior Court. The court admonished the jurors against listening to broadcasts and reading newspaper articles concerning the case, then excused the jury for the day. Attorneys for the three defendants then joined in a request that no reference to the term ''Hell's Angels'' be made during the trial. The trial judge agreed that the phrase had a tendency to inflame the jury, observed that it might have conceivable relevance under some circum-

stances and expressed the belief that the prosecutor would not use it inappropriately. The prosecutor stated that he had no intention of bringing out the phrase himself.

Despite the judge's and attorneys' scrupulous concern for fairness, a reporter for the Sacramento Union wrote and the newspaper published an article under the heading ''Hell's Angels Assault Trial Begins Today.'' The article is reproduced in the margin.[1] The article appeared on the morning of July 28, 1967, the same day on which the jury was to commence hearing evidence. The story labeled all three defendants as members of the Hell's Angels and defendant Waite as former president of the organization's Sacramento chapter. The text demonstrates that in fastening the defendants with the Hell's Angels label the reporter was aware of the trial judge's effort to insulate the jurors from its inflammatory influence.

When court convened on the morning of July 28, all three defendants moved for a mistrial on the ground of publicity impairing fairness of the trial. The trial judge at that point called the jury into the courtroom and asked the jurors whether they had read an article in that morning's Sacramento Union concerning the trial. All jurors except two stated that they had not read the Union that morning. Two jurors stated that they had seen the first few lines of the Union article and immediately discontinued their reading when they realized it concerned the trial. Both these jurors assured the court that they would not permit the story to prejudice them in deciding the case and agreed not to discuss it with their fellow jurors. The court then ordered the trial to proceed, telling the jury that the trial embraced only the evidence coming from the witnesses.

---

[1]                      ''Hells Angels
                         Assault Trial
                         Begins Today.
''Testimony is scheduled this morning in the assault of Hell's Angels Frank Sterling Waite, 26, Ralph Leroy (Mickey) McKee, 24, and Richard Lee Bennett, 18. A Sacramento County Superior Court jury of nine men and three women, with one alternate, was selected Thursday to hear the case. The men are charged with aggravated assault and assault with intent to commit mayhem in connection with the May 6th beer can assault on Dale Wilkins, operator of the Zombie Zula, 670 Fulton Avenue. Waite, former president of Sacramento Hell's Angels chapter, also is charged with attempted murder. Assistant Public Defender Roy Williams obtained a ruling from Judge Albert H. Mundt that the word 'Hell's Angels' was not to be mentioned before the jury unless admissible in evidence. Waite is represented by attorneys Robert A. Zarick and Ernest Winters. McKee is represented by attorney J. Allen Jones.

■ Following the guilty verdict each of the defendants moved for a new trial, urging the Sacramento Union article as a ground. The motions were denied. The appealing defendants now assign denial of the mistrial motions and of the new trial motions as error.

■ The due process of law concept embodied in the Fourteenth Amendment to the federal Constitution requires that the accused receive a trial by an impartial jury free from outside influences.[2] In considering the effect of inflammatory pretrial publicity, trial courts are enjoined to take strong measures to ensure that the balance is not weighted against the accused, and appellate tribunals must make an independent evaluation of the circumstances.[3] ■ The California standard for measuring pretrial publicity's impact upon criminal trials is that recently enunciated in *Maine* v. *Superior Court* (1968) 68 Cal.2d 375 [66 Cal.Rptr. 724, 438 P.2d 372]. Essentially, the *Maine* case requires an inquiry whether ''because of the dissemination of potentially prejudicial material, there is a reasonable likelihood that . . . a fair trial cannot be had;'' the court may make its own evaluation of the nature, frequency and timing of the published material; no showing of actual prejudice is required of the defense. (68 Cal.2d at p. 383.) The standard announced in *Maine* was based upon a proposal embodied in the Reardon Report of the American Bar Association, which in turn was drawn from a declaration of the federal Supreme Court in *Sheppard* v. *Maxwell, supra.*[4]

■ The *Maine* case declares that—as a standard for judicial review on direct criminal appeals in California—the ''reasonable likelihood'' rule will be applied prospectively, that is, to future trials. (68 Cal.2d at p. 384, fn. 9.) The present trial antedated the *Maine* opinion. As a specialized expression of due process demands for the judicial protection of defendants' rights, the rule had previously been enunciated as dictum in the *Sheppard* case. Aside from that phase of it which dispenses with the necessity for demonstrating actual prejudice, the new California rule really seems to summarize

[2]*Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 362 [16 L.Ed.2d 600, 620, 86 S.Ct. 1507].

[3]*Ibid.,* 384 U.S. at p. 362 [16 L.Ed.2d at p. 620].

[4]''But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to another county not so permeated with publicity.'' (*Sheppard* v. *Maxwell, supra,* 384 U.S. at p. 363 [16 L.Ed.2d at p. 620].)

the earlier *ad hoc* approach which held to the criterion of a fair and impartial trial in which ''each case must turn on its special facts.''[5] Because it articulates preexisting law, it may be applied here without retroactive effect.

Most of the northern California public regard Hell's Angels or members of a motorcyclists' organization of that name with distaste, a fact of which we take judicial notice.[6] Thus the Sacramento Union article had intrinsic inflammatory qualities which, permitted to penetrate the courtroom, could impair fairness of the trial. Fortunately, its penetration was shallow. Ten of the jurors were ignorant of the story, conscious only that some kind of publication had occasioned a courtroom inquiry. Only two jurors had noticed it and, obedient to the judge's admonition, had desisted immediately upon recognizing its connection with the case. The headline could not but supply the two jurors with immediate awareness of the accused men's identity as Hell's Angels. In *People* v. *Parker, supra,* 235 Cal.App.2d 100, at page 105, we pointed out that jurors' professions of objectivity must be weighed against the nature of the crime and the color and impact of the publicity. The crime was repellent enough. The publication was a one-time statement which reached two jurors but did not create a hostile trial environment. Although lending itself to bias, it did not infer guilt of the specific crime. Because of its limited courtroom contact and circumscribed prejudicial force, its influence could be sealed off by a cooperative juror acting under firm judicial admonitions. ( Cf. *Delaney* v. *United States* (1952) 199 F.2d 107, 112-113.) Under the particular circumstances the two jurors' expressed willingness to decide the case without regard to the publicity was realistically acceptable. There was no reasonable likelihood of an unfair trial.

## TRIAL SEVERANCE

Before entering upon the joint trial, both Waite and

[5]*Marshall* v. *United States,* 360 U.S. 310, 312 [3 L.Ed.2d 1250, 1251, 79 S.Ct. 1171]; see Cal. Penal Code, section 1076; *People* v. *Jacobson* (1965) 63 Cal.2d 319, 325 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Duncan* (1960) 53 Cal.2d 803, 811-812 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Parker* (1965) 235 Cal.App.2d 100, 105 [44 Cal.Rptr. 909].

[6]Evidence Code, section 452, subdivision (g). In *People* v. *Sawyer* (1967) 256 Cal.App.2d 66, 79 [63 Cal.Rptr. 749], we stated: ''The prosecutor's references to defendants' membership in the Hell's Angels arouse more concern. At several points he indicated the group's 'potential for violence' and 'infamous-reputation.' Under some circumstances statements of this sort would be prejudicial, arousing bias and tending to judgments of guilt by association.''

McKee moved for separate trials. The motions were premised upon *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. Denial of the motions is assigned as prejudicial error.

During the trial an extrajudicial statement by codefendant Bennett was offered in evidence. After an extended *voir dire* inquiry, the court held Bennett's statement admissible, provided that all matter implicating his codefendants was first deleted. A police officer then testified that Bennett told him, "that he had been the individual who had hit the victim in the face with a full can of beer . . . in his words, that after hitting the man, that the man had been, as he described, double wasted." He explained that "double wasted" described a bad physical condition.

■ Although the prosecution may intend to use an incriminating extrajudicial statement of one of several defendants, a joint trial may be permitted if all parts of the statements implicating any codefendant can be and are effectively deleted without prejudice to the declarant. (*People* v. *Aranda, supra,* 63 Cal.2d at p. 530.) While initial editing may sanitize the statement, it may turn out to be damaging in the context of the trial developments. (*People* v. *Matola,* 259 Cal.App.2d 686, 692 [66 Cal.Rptr. 610].)

■ As given to the jury, Bennett's extrajudicial statement had been effectively edited by the deletion of any reference to his codefendants. The latter argue that the prosecution evidence indicated unity of action among the three defendants, hence that Bennett's incriminating statement tended to incriminate them too. As described to the jury, Bennett's admission neither identified nor accused his codefendants. Those functions were fulfilled by the prosecution evidence. The jury instructions fully permitted the jury to adjudicate the guilt or innocence of each defendant individually. Bennett's admission was no more prejudicial to his codefendants than if he had said: "Waite and McKee limited themselves to self-defense, while I alone hit Wilkins with the beer can." The court did not err in denying trial severance.

### INSTRUCTIONS ON PROPRIETOR'S DUTY TO DEFEND PATRON

■ Error is charged in a jury instruction that the owner of a food and liquor establishment has an affirmative duty to protect patrons from attack by fellow patrons.[7] The instruc-

---

[7]The instruction was as follows:
"You are instructed that the owner of an establishment where food

tion was drawn from rules developed in civil damage actions. (See *Slawinski* v. *Mocettini*, 217 Cal.App.2d 192, 196 [31 Cal. Rptr. 613].) In criminal cases the right of protecting one's person or the person of another is defined by the Penal Code. The prosecution theory was that Wilkins went to the aid of Cookie when she was threatened by physical harm by McKee; that when Wilkins himself was threatened, he pulled a pistol to hold off his would-be assailants; that, as soon as he put it away, the defendants attacked and beat him. According to the defense, Wilkins had intervened in a verbal set-to between McKee and Cookie by threatening the former with a gun, while the defendants had used only such physical force as was necessary to wrest away the gun. These rival versions involved the right of self-defense and the right to defend another who is about to be injured. These rights are delineated in Penal Code sections 692, 693 and 694.[8]

Specifically, section 694 fixed the standard by which the jury could measure Wilkins' conduct in coming to the aid of Cookie if it found she was about to be assaulted. If Wilkins' actions did not exceed the resistance limit fixed by section 694, then his conduct was lawful and he was not about to commit a "public offense" against defendants, who could not claim self-defense against his purely resistive efforts. (Pen. Code, § 692; 1 Witkin, Cal. Crimes (1963) § 158.) While embodying the same general motion, the instruction given by the court endowed Wilkins with an "affirmative duty" to protect the girl, a broader endowment than the resistive conduct permitted by section 694. An instruction embodying the latter would have been preferable to the one given. No miscarriage of justice occurred, however. The court supplied the jury with

and intoxicating liquors are dispensed owes an affirmative duty to protect his patrons against personal injury and property damage at the hands of fellow guests. Such an owner must use reasonable care to protect his patrons against injury from the negligent or wrongful acts of other guests on the premises where he has reasonable cause to anticipate such acts and the probability of injury resulting therefrom.''

[8] Penal Code, section 692: "Lawful resistance to the commission of a public offense may be made:

"1. By the party about to be injured;

"2. By other parties."

Penal Code, section 693: "Resistance sufficient to prevent the offense may be made by the party about to be injured:

"1. To prevent an offense against his person, or his family, or some member thereof.

"2. To prevent an illegal attempt by force to take or injure property in his lawful possession."

Penal Code, section 694: "Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the offense."

an otherwise complete array of self-defense instructions. These gave the jury ample ground for a defense verdict if they accepted the truth of the defendants' testimony. The verdict was not a product of the assailed instruction but of the jury's rejection of that testimony.

### ALLEGEDLY INFLAMMATORY PHOTOGRAPH

■ Waite assigns prejudicial error in the admission of two photographs portraying him with long hair and a beard, wearing a black shirt, soiled corduroy trousers and short boots. Wilkins took the stand as a prosecution witness. He knew McKee before the evening of the fight and identified him in the courtroom. The prosecutor then turned his attention to Waite. On direct examination Wilkins stated that a man with long hair and a beard was in the Zombie Zula parking lot that night. In response to further questions, Wilkins said he could not recognize the man in the courtroom but that it might be Waite. (At the time of the trial Waite was clean-shaven.) At that point Waite's counsel offered to stipulate that Waite had indeed been in the parking lot on the night in question. The prosecutor declined the stipulation. He showed Wilkins the two photographs and the witness positively identified the subject as the man who had been in the parking lot. Waite's trial counsel objected only to the lower part of the photograph, stating he had no objection to the upper portion if offered for the purpose of identification.

Although the attorney did not clearly state it, his objection was apparently grounded on the theory that the lower part of the photograph was inflammatory. This ground is urged on appeal, the theme being that boots are associated with motorcyclists, who in turn are objects of public antipathy. The photograph served a legitimate trial purpose, for the prosecution's case called upon Wilkins to identify the now clean-shaved Waite as his bearded attacker. The proffered stipulation did not fulfill that need. The boots evoke no emotion whatever among the members of this court, and we can only believe that the reaction of reasonable jurors would be similarly flat. (See Evid. Code, § 352.)

The appeals from the orders denying motions for new trial are dismissed. Judgments affirmed.

Pierce, P. J., and Regan, J., concurred.

The petition of appellant Waite for a hearing by the Supreme Court was denied October 17, 1968. Peters, J., was of the opinion that the petition should be granted.