*NORTH CAROLINA R. R. CO. and JOHN W. GRAHAM *v.* N. H. D. WILSON.

*Breach of Trust—Removal of Trustee—Appointment of Receiver—Parties.*

The defendant was appointed by the plaintiff company trustee of a sinking fund to pay the debts of the corporation, and it was provided in the trust deed that the moneys of said fund might be invested, in the discretion of the trustee, in such securities as the president of the company or its board of directors might recommend. The trustee, without any previous direction, loaned a portion of said moneys to a banking firm of which he was the senior member, and which soon thereafter became insolvent: *Held,*

(1) That such action constituted a breach of trust, which it was not in the power of the board of directors to condone, their relation to the company being that of an agent to his principal.

(2) That the misconduct was not relieved by taking collaterals to secure such loan which the trustee thought to be good at the time of taking them.

(3) That the creditors to be paid out of said sinking fund are not necessary parties to a proceeding to remove the trustee.

(4) That taking a bond from the trustee is but a subsidiary security for his fidelity, but is not a substitute for his personal fitness for the place.

(5) That the foregoing facts constitute sufficient grounds for the removal of the trustee and the appointment of a receiver to take charge of the fund until the acts and dealings of the former trustee can be thoroughly investigated.

MOTION by plaintiff for the appointment of a Receiver and for an Injunction heard at Chambers in Greensboro on the 20th of January, 1879, before *Kerr, J.*

The facts appear in the opinion. The motions were refused and the plaintiff company appealed.

---

*Dillard, J., having been of counsel did not sit on the hearing of this case.

*Messrs. Thos. Ruffin* and *L. M. Scott,* for plaintiff.

*Messrs. J. A. Gilmer, Boyd & Reid, W. S. Ball,* and *F. C. Robbins,* for defendant.

Smith, C. J. On the 29th of February, 1868, the North Carolina railroad company, to secure and give credit to a series of bonds proposed to be issued for its benefit, conveyed to William A. Graham, trustee, its entire property of every kind upon the trusts that are therein particularly declared, and among other things in the seventh article provided as follows : " On the first of January, 1869, and on the first of January in each succeeding year thereafter, the said party of the first part (the N. C. R. R. Co.), its successors and assigns for the further security and ultimate redemption of the bonds intended to be secured thereby, for the creation of a sinking fund for that purpose, shall pay to the trustee for the time being, such a sum of money as at the periods when the three classes of bonds above mentioned have respectively matured and become payable, shall, in the judgment of the trustee, furnish a fund sufficient wholly to pay off and discharge such bonds, and the trustee shall deposit the sum so paid over to him in the United States trust company in the city of New York or some other depositary which shall be in his judgment safe ; and the said moneys, together with all accumulations of interest thereon, if any, which may actually come into the hands or within the disposal of the trustee, shall be laid out and invested by him in the purchase of bonds secured by these presents, upon the most favorable terms on which they can be purchased. The bonds so purchased with the coupons thereto annexed shall be immediately canceled by the trustee, and a certificate of the numbers and amounts of said bonds shall be immediately furnished under his hand by the said trustee to the president of the North Carolina railroad company. In case bonds secured by these presents cannot be purchased upon

favorable terms, then the said trustee may in his discretion invest the said sinking fund moneys in such securities as may from time to time be *recommended to him* by the *president* of the said North Carolina railroad company for the time being, or by the *board of directors of said company.*"

In article ten it is declared " that in case at any time hereafter the said trustee, or any trustee hereafter appointed, shall die or resign, or become incapable or unfit to act in the said trust, a successor to such trustee shall be appointed by said company, and the trustee so appointed shall thereupon become vested with all and singular the powers, authorities and estates granted to and conferred upon the party of the second part (said William A. Graham) by these presents, and all the rights and interests requisite to enable him to execute the purposes of this trust without any further assurance or conveyance, so far as such effect may be lawful; and upon the death, resignation, or removal by any court of competent jurisdiction of any trustee, or an appointment in his place in pursuance of these presents, all his powers and authorities by virtue hereof shall cease."

The trustee entered upon and continued in the discharge of his duties until his death in August, 1875, when the board of directors appointed the defendant in his stead. Shortly thereafter, on the 14th of September, 1875, the executor of the deceased trustee came to a settlement with the defendant and delivered over the trust funds to him, taking his receipt therefor. It appears from the receipt that the fund consisted of three individual bonds for $13,000, two of the second series of secured bonds due in 1877, twelve of the last series due in 1888, and of deposits in the state national bank of Raleigh and in three other banks of Charlotte, in the aggregate sum of $73,072.07, the total paid being one hundred thousand one hundred and eleven dollars and a few cents; and with which the defendant charges himself in his first annual account rendered in May, 1876. This account

15

shows a balance in the hands of the defendant of $96,285.26, constituted of the twelve bonds of the series due in 1888, the individual bonds received from the executor, deposits remaining in two of the Charlotte banks $30,000, and deposits in the banking house of Wilson & Shober, of which the defendant is senior partner, $40,477.27.   Of these latter, it appears from the certificates of deposit filed, that $25,000 were deposited October 16th, 1875; $22,000 November 6th, 1875; and the residue was a general deposit; while during the interval the defendant had withdrawn from the banks a little over $43,000.

During the succeeding year, as appears from the second account, the defendant received from the treasurer of the company, and in interest, $93,740.44, and paid out about $1,000, leaving in his hands May 2nd, 1877, $191,019.70, the items of which are given in detail.   The fund was then constituted of the individual notes and the twelve bonds originally received, the deposit of $47,000 with Wilson & Shober, other personal loans, ten U. S. six per cent bonds, cash deposits in bank $13,907.63, and of bonds and debt of the Atlantic, Tennessee and Ohio Railroad Co. $73,670.57. This last mentioned investment was made under the direction of the board of directors.

The last account rendered in May, 1878, shows that besides the sum already in hand, the defendant collected from dividends of the road and from other sources $32,380.72, and disbursed in the redemption of secured bonds, including loss in resale of the U. S. bonds and a small sum for express charges $87,740.42, leaving the sum of $135,660; and this consisting of the original individual bonds $7,000, the investment in debts of the A. T. & O. R. R. Co. $73,670.57, deposits remaining with Wilson & Shober $41,311.50, the individual loans to others mentioned in preceding returns, and a small sum on general deposit with Wilson & Shober and in state national bank, of $677.93.

The twelve bonds of the company of the last series which had been redeemed by the first trustee and were delivered over to his successor uncanceled, as well as the U. S. bonds, were during the fiscal year sold and the proceeds disposed of as is represented in the accompanying statement of the condition of the fund.

These accounts were submitted, and full and detailed explanations of the collaterals and other securities then held made by the trustee to the board of directors, and embodied in their reports to the annual meetings of stockholders without any express intimation of disapproval of his management until June 19th, 1877. At the meeting of this date the report of the finance committee charged with the duty of examination and made to the stockholders, indicates an expectation that the bonds to fall due in November ($165,000) would " be provided for by the trustee out of the sinking fund," and suggests to him the exercise of great caution on the part of the trustee in making loans "to individuals on collaterals or mortgages," assigning as a reason therefor "the fluctuating character of collaterals and the very great difficulty of realizing under forced sales of real estate in times like the present."

It appears from transcripts of proceedings before the board of directors that on the 23rd of October, 1877, the defendant was instructed " to pay all the bonds of the North Carolina railroad company which mature November 1st, 1877, out of the sinking fund now in his hands"; and again on the 21st of June, 1878, they passed a similar resolution requiring the trustee to collect forthwith all the debts due the sinking fund (except the debt due by the A. T. & O. R. R. Co.) and that he pay off all the past due bonds and accrued interest thereon of this company, except the bonds held by E. M. Holt, about $20,000.

On the 11th of July, 1878, after the failure and assignment of the defendant's firm, the stockholders adopted the report

of a committee of their number recommending to the direc-
tors to make a full examination of its financial matters, and
" to take all necessary steps to protect the interests of the
company therein." The board of directors met on the same
day and adopted and approved the report of their committee
charged to inquire into "the affairs of N. H. D. Wilson,
trustee," and therein say, "that on account of the large
indebtedness of Wilson & Shober to the trustee of the sink-
ing fund of the North Carolina railroad company, and the
failure of that firm, and the doubtful value of the securities
taken by the said trustee to secure his loans to the said
firm, the said N. H. D. Wilson is not a proper person to act
in the trust, and that if he does not resign, then this board
ought to take further action in the matter." This resolution
was communicated to him on the 15th day of that month
by the president, and the defendant refused to surrender
the place, complaining of the hasty and summary action of
the board without giving him notice and permitting him an
opportunity of self-defence, and assigning many reasons
constraining him to disregard the intimation expressed in
the resolution.

On the 20th of September thereafter the board of direc-
tors passed a resolution removing the defendant and de-
claring "that by reason of the failure of N. H. D. Wilson,
trustee of the sinking fund, to obey the instructions of the
board of directors of said company in regard to the collec-
tion of the debts due the sinking fund, and to pay off past
due bonds and accrued interest, and by reason of his using
the funds in his hands as trustee in his private business,
and to the injury of the company, the board of directors by
virtue of authority in them vested, do hereby declare that
the said N. H. D. Wilson is unfit to act in said trust, and he
is therefore removed." At the same time the plaintiff, John
W. Graham, was appointed in his place.

Numerous notes belonging to Wilson & Shober were at

the date of the loans in October and November separated from their effects and kept by the trustee as collateral security therefor, and much evidence was offered as to the sufficiency of the security. The character and value of the collaterals were fully explained by the trustee to the board in his first official report, verbally as well as in writing, and no dissatisfaction was then felt or expressed in regard to the loan to the firm. And upon these representations the board thought the security full and ample. The loans, however, do not seem to have had the previous sanction of the president or board of directors, nor were they consulted in advance about them.

There was much controversy as to various particular collaterals, their value, and the legal liability of those whose names were upon them; and the argument before us was mainly upon the good faith of the defendant, the legal sufficiency of the facts proved to justify his removal, and the capacity of the board to remove in the manner in which it is here attempted to be done.

To insure the faithful management of the trust, the defendant on the 13th of March, 1877, executed a bond in the penal sum of $100,000, with sureties justifying to that amount, and delivered it to the company.

We have given this summary of the material facts upon which the motion for a receiver and an injunction was pressed, and the defence offered thereto. The correctness of the ruling of the court in its refusal to make either order is the only question before us on the appeal.

The suit is instituted upon the basis of the legal appointment of the plaintiff, Graham, in place of the defendant, as trustee to secure the trust fund and compel its delivery to him; but the company seeks relief, if the removal and new appointment have been ineffectual, in the appointment by the court of a trustee to whom these funds shall be delivered, and meanwhile for a receiver to take charge of them

until the controversy upon its merits has been determined. But this issue, though elaborately and ably discussed, is not now before us, and our duty is limited to the decision of the question whether the funds have been hitherto properly managed, and their probable safety where they remain. We do not deem it necessary to inquire into the moral aspects of the controversy; this is beyond our province; nor to impute any intentional wrong to the defendant. We must determine the case upon strict principles of law and enforce the well settled rules of a court of equity in regard to the management and use of trust funds. It is an inexorable rule in a court of equity where such matters are properly cognizable, that trust funds must be managed exclusively in the interest of the beneficiary, and cannot be appropriated to the use of the trustee or of any firm of which he is a member, or in which he has a contingent interest. And such use of the fund involves a breach of fiduciary obligation. "Trustees cannot use trust money in their business," says Mr. Perry, "nor embark it in any trade or speculation; nor can they disguise the employment of the money in their business under a pretence of a loan to one of themselves, nor to a *partnership of which they are members;* nor can the money be loaned on security to be reloaned back to the trustee at a profit." 1 Perry on Trusts, § 464. The rule seeks to remove all temptations to hazardous risks of the fund, and to place it under the supervisory control of one whose only interest, coinciding with legal duty, will be to secure its safety and all its benefits to the rightful owner. The law frowns upon any act on the part of a fiduciary which places interest in antagonism to duty, or tends to that result. Let us apply the principle to the facts of the present case.

The defendant within about six months after the funds passed into his possession withdraws a large amount of the moneys from depositaries, safe as far as appears to us, to

which the former trustee had confided them, and deposits them in his own banking house which in about two years thereafter becomes insolvent. It is true he selects and lays aside notes and other securities belonging to the firm as an indemnity against loss, but the same mind and under like influences offers and accepts the collaterals, and there is absent in the transaction the sharp lookout, careful scrutiny, and cautious judgment of an impartial trustee whose only duty is to take care of the interests he has in his charge. Whether these collaterals may ultimately yield a sum sufficient to wipe out the indebtedness of the insolvent firm to the trust is not material to the present inquiry. It is enough to say the moneys of the sinking fund are locked up in that deposit, and are not now available for the purposes for which it was formed. So when the directors in two resolutions, passed in October and June, required the application of the moneys to the retirement of the overdue bonds of the second class, the firm depositary had used the moneys and were unable to replace them. Again, when the firm is yielding to the pressure of accumulating embarrassments and approaching its unavoidable insolvency, the defendant finds it impracticable to restore the moneys; and, as testified to by the president, when asked if that could not be done, his only reply is, "I could have done so, but it would have embarrassed Wilson & Shober." Thus the conflict was working out its practical fruits, and in the moment of peril the fund is without its natural and legal protector. And so the deposit, with all its accruing interest, except some $6,000 returned, remains in a failing house until its financial ruin in the early summer, and the general assignment put an end to its further operations. Now the reason and necessity of the rule are manifest in the very misfortunes which have followed the first unwise departure from its requirements, and in the want of that constant and single care and unre-

mitting oversight to which a trust fund is always entitled from him who has to manage it.

The company complains of another unauthorized act of the defendant in the sale of the twelve bonds received from the preceding trustee. They had been redeemed with its own moneys provided for that purpose, and under the requirements of the deed should have been canceled and so much of the debt extinguished. They were retained by the defendant and disappear from the list of assets returned in May, 1878, having been disposed of to raise means to meet the pressing overdue debt, while more than $40,000 were then on deposit with his own banking house. The defendant does not seem to have made an effort, or if he did it was fruitless, to withdraw the moneys deposited with his own firm for the urgent necessities of the company; and there it remained with the knowledge we must suppose he possessed of impending calamity. This is the result of the error in making the original misapplication.

In the argument it was contended that the loans received the implied sanction of the directors and do not constitute ground for the removal. If this were true, it must be remembered that both are but fiduciary agencies of the corporation, and their concurrence in the breach of trust would not relieve the trustee who acts under the provisions of a deed which creates the trust and directs the manner of its execution. But we do not so understand the action of the directors. Accepting the condition of the fund as reported by the defendant, they examined the collateral security which he had set aside, and in the light of his explanations pronounced it sufficient. But no approval of the loan itself effected by the individual act of the trustee, is given.

It was also contended that the bond executed with sureties by the defendant, for his faithful care and management of the trust funds, guarantees the return of the money, and shows it not to be in peril, and that hence there is no good

reason for his removal. The bond of the trustee is but a subsidiary security for his fidelity, but is not a substitute for his personal fitness for the place. It is the duty of the court, when it appoints, to select a competent and suitable person for the office, and at all times, when called on, to enforce the performance of his duties. Any ascertained dereliction in this regard demands its prompt interference for the safety of the fund. We cannot see therefore how the bond, though a wise and prudent precaution against loss, can affect the question of personal competency involved in the present proceeding.

We do not deem it important to enquire as to the ultimate recovery of the loans from the proceeds of the appropriated collaterals. The fund is now, for all practical purposes, unavailable, and though after long and expensive litigation, it may be restored, it fails to accomplish the very object contemplated in its creation. The defendant's insolvency and unsuccessful management of his own business matters may well be considered in passing upon the question of the longer continuance of his trusteeship. Whatever may be the issue of the controversy as to the possession of the office, it is manifestly proper, during its pendency, to place the funds of the company in a safe condition to await the result, and the plaintiff's motion ought not to have been refused.

It is suggested that the bondholders are interested parties, and no complaint proceeds from them, and hence none should be entertained from the company. But the company has also an abiding interest in having the bonds paid and the incumbrance removed from its property, and in the return of any residue when they are paid. But a sufficient answer to the suggestion is furnished by an examination of the deed itself. By the 10th article already cited, the duty of interposing for the removal of an unfit trustee and the appointment of a successor is devolved upon the company,

with the continuing oversight necessarily incident thereto, and it must act in the premises when the occasion requires, alone or in association with the secured creditors, in enforcing the due execution of the trusts of its own deed. Should both the company or its agency, the board of directors, and the trustee be derelict and the fund become exposed to danger, undoubtedly the court would entertain an application for procedure against both parties from the several creditors. But when they acquiesce in a movement of the company for their own security and benefit, their inaction affords no defence to the trustee.

We do not, as we have already said, intend to impute any dishonest purpose to the defendant. But he has acted unwisely and in opposition to those well settled rules in reference to trust funds, which we must maintain in their integrity and force; because in their observance reposes the safety of estates in the hands of trustees. The court erred in refusing the motion of the plaintiff.

This will be certified to the end that said motions be allowed, and that further proceedings be had in the cause according to law.

Error.                                         Reversed.