UNITED STATES, Appellee,

v.

Howard W. YOUNG, Defendant, Appellant.

Nos. 90–1581, 90–1619.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1991.
Decided Jan. 28, 1992.

Janis M. Berry (by appointment of the court), with whom Ivan B. Knauer and Ropes & Gray, Boston, Mass., were on brief for defendant, appellant.

Cerise Lim–Epstein, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before BREYER, Chief Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

BREYER, Chief Judge.

Howard Young, a lawyer, administered Veterans' Administration funds as a guardian for a disabled World War II veteran. *See* 38 U.S.C. § 5502. A jury, finding that Young wrongly used the veteran's money for his own purposes, convicted him of embezzlement and mail fraud. 38 U.S.C. § 3501; 18 U.S.C. § 1341. The district court imposed a twelve month prison sentence. Young appeals his convictions and the sentence. We affirm both.

## I

### *The Facts*

The evidence permitted the jury to take the underlying facts as follows:

1. On July 1, 1970, the Bristol County Probate Court appointed Young (an attorney and former judge) guardian for a veteran receiving benefits from the Veterans' Administration (VA).

2. Young normally kept the veteran's money invested in safe securities, such as certificates of deposit, held by Merrill Lynch in a guardianship account. By the end of 1985, the veteran's fund amounted to more than $250,000.

3. In August 1985 Young filed a personal bankruptcy petition.

4. Between June 1986 and June 1987 Young withdrew about $250,000 from the Merrill Lynch guardianship account. Young deposited most of this money in the bank account of Tomar Farms, a company that invested in racehorses. Young's daughter owned Tomar Farms, and Young was the company's president, treasurer, clerk, and sole director. In return for this money, Tomar Farms (through Howard Young, its president) signed promissory notes, to Howard Young as guardian, paying 12% interest, payable upon maturity two years later. Tomar Farms also signed a "security agreement" pledging to the guardian, as security, a horse called "Supreme Roman" and all other subsequently acquired "livestock." Tomar Land, another company that Young operated and his daughter owned, gave the guardian a second (unrecorded) mortgage on a farm in Kentucky, which mortgage (perhaps through inadvertent misstatement) said that it was security for money advanced "by Tomar [Farms] to Guardian," rather than the other way around.

5. In 1986 Tomar Farms bought the horse Supreme Roman for $175,000, payable over time. It also invested $28,000 in a racehorse investment partnership called the "No I Won't Stable." By the end of 1987, however, Tomar Farms' stable investments had proved unprofitable: its horse, Supreme Roman, was repossessed (for Tomar Farms failed to keep up payments), and Tomar Land had sold its Kentucky farm.

6. In 1987 the VA noticed that Young had not filed his guardianship accounting information for 1986. It sent him a series of letters, followed by telephone calls, and eventually obtained a court order requiring him to file the account by January 1988. In March 1988, he filed accounting information for both 1986 and 1987, but he left blank the sections where, in prior accounts, he had listed the Merrill Lynch securities. He also left blank the space for his signature. In April 1988, he supplemented his 1986 and 1987 filings, listing as primary assets "mortgage secured note[s] receivable." In the April cover letter, he said that, because of declining interest rates, he had

decided to transfer the long range certificates of deposit to a two year program of real estate and bloodstock investment [in a company that] ... has among its owners certain members of

my family who have expertise in these areas. This new investment is in the form of notes payable on September 15, 1988 and secured by mortgages. In further correspondence with the VA, Young described the virtues of the "bloodstock" business, explained that he ran the relevant corporations (but held no ownership interest), and added that Supreme Roman, the Kentucky farm, and the investment in the No I Won't Stable (which would, he wrote, "provide total proceeds of something in excess of $10,000,000") secured the loans. On June 27, 1988, he wrote the VA that he was "enclosing" the "real estate mortgage and Security Agreement that is the formal collateral for the series of six (6) notes which represent the money invested."

7. Tomar Farms did not pay back the loans, nor did it pay interest, and, in October 1988, the Probate Court appointed a new guardian for the veteran's estate, which (though the jury did not learn this) was reimbursed for the loss by a bonding company.

## II

### *The Meaning of "Embezzlement"*

█ The jury convicted Young of violating 38 U.S.C. § 3501(a) (current version at 38 U.S.C. § 6101(a)), which makes it a crime for

a guardian ... having charge and custody in a fiduciary capacity of money ... paid under any of the laws administered by the Veterans' Administration ... [to] embezzle or in any manner misappropriate any such money....

Young says that the evidence does not permit the jury to find him guilty of violating this statute because he did not "embezzle" any money. The district court, he adds, did not understand what "embezzlement" means; it therefore wrongly permitted the jury to convict him on the basis of evidence insufficient to show that he did more than make a poor investment decision.

We disagree. The crime of embezzlement has long had a clear meaning. In the eighteenth century, English courts held that only those who *took* money, not those to whom money was lawfully *entrusted*, could commit common law larceny. *Rex v. Bazeley*, 2 Leach 835, 168 Eng.Rep. 517 (1799); *see also Rex v. Waite*, 1 Leach 28, 168 Eng.Rep. 117 (1743). Consequently, Parliament enacted the first embezzlement statute, designed to prohibit, say, bank tellers or guardians from converting the (lawfully *obtained*) money of others to their own use. *See Bazeley*, 168 Eng.Rep. at 523–24 (discussing statute, 39 Geo. III, c. 85); *see generally* 3 Charles E. Torcia, *Wharton's Criminal Law* § 395, at 398–402 (1980). More than one hundred years ago, the Supreme Court referred to embezzlement's "settled technical meaning," *United States v. Northway*, 120 U.S. 327, 334, 7 S.Ct. 580, 584, 30 L.Ed. 664 (1887), recently described as "the fraudulent conversion of the property of another by one who is already in lawful possession of it." 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 8.6, at 368 (1986) (numerals omitted).

█ The notion of "fraudulent conversion," at the heart of embezzlement, may sound obscure, but, in fact, it is not. It essentially refers to, say, a bank teller, trustee, or guardian using money entrusted to him by another person for his own purposes or benefit and in a way that he knows the "entruster" did not intend or authorize. Thus, one basic source says that the

word "conversion" within the meaning of embezzlement statutes is a fraudulent appropriation of a thing to one's own use and beneficial enjoyment, or an unauthorized assumption and exercise of dominion or right of ownership over it in defiance of, or exclusion of, the owner's rights.

29A C.J.S. *Embezzlement* § 11(a), at 26 (1965) (footnotes omitted). Another says that "fraudulent conversion" is

fraudulently withholding, converting, or applying [property that is lawfully in one's possession] to or for one's own use and benefit, or to [the] use and benefit of

any person other than the one to whom the money or property belongs.

*Black's Law Dictionary* 662 (6th ed. 1990). And cases offer such statements as

> The gist of [embezzlement] is the appropriation to the defendant's own use of property delivered to him for a specified purpose other than his own enjoyment of it.

*People v. Parker*, 235 Cal.App.2d 100, 44 Cal.Rptr. 909, 914 (3d Dist.1965) (citing cases). An embezzler, like a thief or a swindler, may commit the crime in any of à myriad of different ways. *See People v. Swanson*, 174 Cal.App.2d 453, 344 P.2d 832, 836 (3d Dist.1959) (" 'There is no settled mode by which this appropriation must take place, and it may occur in any one of the numberless methods which may suggest itself to the particular individual. The mode of embezzlement is simply [a] matter of evidence.' ") (quoting *Leonard v. State*, 7 Tex.App. 417, 444 (1879)). But, in each instance, the embezzler will have acted for his own purposes and contrary to authorization. He will have "fraudulently converted" property entrusted to him by another.

The record here provides more than enough evidence to permit the jury to find embezzlement. The jury could conclude that Young was in financial trouble, that the Tomar companies that his daughter owned were in financial trouble, and that Young wanted to find money for those firms, to help his family, and thereby to help himself. The jury could also conclude that his use of the guardianship money for this purpose was not authorized, and was contrary to the intent of the "entruster," because (1) the investment was unusually risky, and (2) the investment created an obvious conflict between, on the one hand, his desires as a parent and duties as a corporate officer (to obtain ready financing for the companies), and, on the other, his obligations as a guardian (to invest soundly for the benefit of the veteran). *See Johnson v. Witkowski*, 30 Mass.App.Ct. 697, 573 N.E.2d 513, 519, *review denied*, 411 Mass. 1104, 581 N.E.2d 481 (1991); *Whitney v. Whitney*, 317 Mass. 253, 57 N.E.2d 913, 916 (1944) (" 'The law frowns upon any act on the part of a fiduciary which places interest in antagonism to duty, or tends to that result.' ") (quoting *North Carolina R.R. Co. v. Wilson*, 81 N.C. 223, 230 (1879)); George G. Bogert & George T. Bogert, *The Law of Trusts and Trustees* § 543(J), at 308–09 (1978); 90 C.J.S. *Trusts* § 248(a), at 247 (1955) ("trustee must act for the beneficiaries, and not for himself in antagonism to the interests of the beneficiaries; he is prohibited ... from placing himself in any position where his self-interest will, or may, conflict with his duties as trustee") (citing cases).

The jury could conclude that Young acted fraudulently because, among other things, his letters and responses to the VA state, or imply, that he held good security for the loans, long after that security (the horse Supreme Roman and the Kentucky farm) had become worthless.

Above all, the jury could find that Young *knew* that he was acting contrary to the VA's intent and to his authority to invest the veteran's money because: (1) Young's conduct clearly violated his fiduciary obligations. *See, e.g., In re Estate of Stowell*, 595 A.2d 1022, 1025 (Me.1991) (fiduciary may not lend to himself); *Attorney General v. Flynn*, 331 Mass. 413, 120 N.E.2d 296, 302 (1954) (same); *Attorney Grievance Comm'n v. Pattison*, 292 Md. 599, 441 A.2d 328, 332 (1982) ("fiduciary may not make a loan, secured or unsecured, unto himself"); *Restatement (Second) of Trusts* § 170(1), comment 1, at 369 (1959) (trustee cannot "lend trust money to himself"); 2A Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 170.17, at 385–86 (4th ed. 1987) ("trustee cannot properly lend trust funds to himself. This is true even though by the terms of the trust he is given the widest powers of investment.") (citing cases). (2) The jury knew that Young was an attorney, and attorneys normally understand the rudiments of fiduciary obligation. And, (3) the jury also knew of Young's long delays in responding to VA inquiries. Those delays, and the nature of the ultimate responses, also could indicate Young's *knowledge* that what he was doing was wrong. *See United States v.*

*Strickland,* 509 F.2d 273, 276 (5th Cir.1975) (in § 3501 prosecution, "concealment and falsification may reveal a consciousness of guilt and so help to carry the prosecutor's burden, or indeed, as to intent, may carry it alone").

From this evidence, the jury could reasonably conclude that Young (1) *intentionally* used the veteran's money, of which he was guardian, (2) *for* his own benefit and purposes and (3) *contrary* to the intent or authorizations of the guardianship. He thereby "fraudulently converted" that money and therefore is guilty of embezzlement.

■ Young makes several additional, unconvincing arguments to the contrary. First, he says that, *ex ante,* one might have thought his investments would not fail, that he did not "appropriate" the money but simply "borrowed" it, and that, at worst, he committed a civil, not a criminal, wrong. The success or failure of the investments, however, is beside the point; a bank teller who plays the horses with the bank's money has embezzled it, even if he wins and replenishes the till, even with interest. Young's *borrowing* of the money is what constitutes the misappropriation. And, it is well established that the use of loan documents will not legitimate acts otherwise constituting embezzlement. *See, e.g., Young v. State,* 44 Ohio App. 1, 184 N.E. 24, 27 (1932) ("The giving of a note for money received from another, if a mere incident to the carrying out of a fraudulent scheme, does not prevent the act from being an embezzlement.") (citation omitted); *Stecher v. State,* 202 Wis. 25, 231 N.W. 168, 170 (1930) (same); *State v. Larson,* 123 Wash. 21, 211 P. 885, 888 (1923) ("The mere fact that the transaction may take the form of a loan would not necessarily deprive it of its criminality."); *Reeves v. State,* 95 Ala. 31, 11 So. 158, 163 (1892).

■ Second, Young says that he intended to return the money, whether or not the Tomar companies failed, that there is no evidence to the contrary, and, that, consequently, there is no embezzlement. He cites, in support, a brief phrase of Learned Hand, describing the statutory offense as "converting [the property] *unconditionally.*" *United States v. Lewis,* 161 F.2d 683, 684 (2d Cir.1947) (emphasis added). The word "unconditionally," however, has nothing to do with any issue before us; Judge Hand used it to contrast an unauthorized "pledge" (where the fiduciary would likely receive the property back) with a conversion of the property. Regardless, an "intent to return" money or property is not a defense to a charge of embezzlement. *United States v. Angelos,* 763 F.2d 859, 861 (7th Cir.1985) ("it is irrelevant to a charge of embezzlement that the embezzler intended to return the money he embezzled—or even that he did return it"); *United States v. Coin,* 753 F.2d 1510, 1511 (9th Cir.1985) (per curiam); 2 LaFave & Israel, *Substantive Criminal Law* § 8.6(f)(3), at 380 ("It is uniformly held that the intent to restore the equivalent property ... is no defense to embezzlement.") (citing cases).

Third, Young says that, if the statute applies to his actions here, it is unconstitutionally vague. *See United States v. Anzalone,* 766 F.2d 676, 680 (1st Cir.1985). We see nothing vague, however, about legal terminology used for nearly two hundred years. Those to whom others entrust money can perfectly well understand that they are not to use that money for their own purposes, contrary to authorization, and in a fraudulent way. If Young means, by this argument, simply to repeat that he did not know he was not supposed to invest the veteran's money as he did, we shall simply repeat that the jury could find otherwise.

Fourth, Young complains specifically of the judge's failure to give several proposed jury instructions that embodied his view of the law. Insofar as he argues that the judge should have instructed the jury that "intent to return" is a defense, he is, as we have already noted, wrong on the law. *See Coin,* 753 F.2d at 1511 ("intent to return property is not a defense to embezzlement"). (Indeed, some model jury instructions specifically include the charge, "the fact that the defendant may have intended to repay the funds is not a defense." *Manual of Model Jury Instructions for the*

*Ninth Circuit* § 8.06A, at 119 (1985) (18 U.S.C. § 656).)

■ Insofar as Young argues that the judge should have told the jury that he had to have a specific intent to defraud, or that the judge should have pointed out that simple negligence, or actions taken in good faith, are not criminal, he received the instructions to which the law entitles him. The judge told the jury that the law "will not punish somebody who does not have criminal intent," that such intent means the action "is done with a bad purpose, either to disobey or to disregard the law," that the act is not culpable if done "because of some mistake or accident or otherwise innocent reason," that "[n]egligence, bad judgment, neglect, will not support a violation of Section 3501," and that the "government must prove that there was an embezzlement or misappropriation done willfully and intentionally. Not by inadvertence or by carelessness." The judge's instructions follow standard jury instructions on such matters. *See, e.g.,* 1 Edward J. Devitt & Charles B. Blackmar, *Federal Jury Practice and Instructions, Civil and Criminal* § 14.03, at 377 (3d ed. 1977) (specific intent); 2 Edward J. Devitt, Charles B. Blackmar & Kevin F. O'Malley, *Federal Jury Practice and Instructions, Criminal* §§ 30.03–04, at 238–50 (4th ed. 1990) (embezzlement); 2 *Federal Criminal Jury Instructions of the Seventh Circuit* 82 (1984) (18 U.S.C. § 656). And, they were legally sufficient. *See United States v. Nivica,* 887 F.2d 1110, 1124 (1st Cir.1989) (citing cases), *cert. denied,* 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990); *New England Enterprises, Inc. v. United States,* 400 F.2d 58, 71–72 (1st Cir.1968), *cert. denied,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581 (1969); *see also United States v. McGill,* 953 F.2d 10, 12 (1st Cir.1992); *United States v. Dockray,* 943 F.2d 152, 155 (1st Cir.1991). *But see, e.g., United States v. Casperson,* 773 F.2d 216, 222–24 (8th Cir.1985); *United States v. Hopkins,* 744 F.2d 716, 717–18 (10th Cir.1984) (en banc). *Cf. Green v. United States,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985) (White, J., dissenting from denial of certiorari and noting divergence among circuits).

Finally, Young points to two cases which, he says, show that the evidence was insufficient to convict him of embezzlement. We do not find these decisions particularly relevant. In one of them, *Giragosian v. United States,* 349 F.2d 166 (1st Cir.1965), a bank officer approved loans to financially irresponsible persons. This Court reversed, because there was no evidence that the officer *knew* that the recipient was financially irresponsible, and so no evidence of any intent to defraud the bank. *Id.* at 168–69. In the other, *United States v. Gens,* 493 F.2d 216 (1st Cir.1974), the defendants made loans to one party, knowing the money would be given to another party. We found that, because the third party was a financially capable party responsible for the loans, there was no evidence that the defendants knew that they should not make loans of the sort in question. *Id.* at 222. As we have explained, however, in this case, the record contains sufficient evidence that Young's actions constituted embezzlement and that he knew he should not lend the guardianship funds to companies that he or his family controlled.

### III

### *The Questioned Juror*

■ Young argues that the district court coercively intruded into jury deliberations by questioning one juror after the jury had begun to consider the case. While it is unusual for a judge to call a juror out of deliberations and question her, the facts of this case make clear that the judge was justified in speaking with the juror and that nothing he said was coercive.

After the first day of jury deliberations, the jury clerk happened to notice a particular juror come to pick up her check. The clerk was surprised to see that the juror was participating on the panel, for she recalled the juror having said to her, at the start of jury selection, that she (the juror) feared she could not be fair. The clerk thought, although she was not certain, that the juror had mentioned that religious convictions would prevent her from reaching a

decision. The clerk then reported these earlier events to the judge. The judge, in the presence of counsel, questioned the clerk under oath. The prosecutor and defense counsel also examined the clerk. And, the judge questioned a court security officer who said he believed the same juror had told him, during the trial, that she wished to switch seats with an alternate juror.

At this point, the judge, over defense counsel's objection, called in the juror and questioned her briefly in the presence of counsel. The questioning proceeded as follows:

THE COURT: ... please, would you sit for a moment, please, with us.

I've called you down to talk with you for a moment about a conversation or a remark or ... a communication you may have had with the court officer yesterday.

JUROR NO. 8: Mm-hmm.

THE COURT: And we're not sure what it was, and we don't know if it's because you have some physical discomfort or bad hearing or any other reason that we can help you with and make it easier for you, but it was told to us that you may have wanted to trade with another juror. We don't know. We don't know why you wanted to do it. We thought—

JUROR NO. 8: I am—

THE COURT:—we'd have you come here, and we thought it might be something physical or you were cold or you were hot.

JUROR NO. 8: No, no, nothing to do with that.

THE COURT: But you did tell him you wanted to trade?

JUROR NO. 8: Yes, if I could. I didn't know if it was possible or not. And I mentioned it to him to see his reaction. And he didn't think it was.

So—my reason, you want to know?

THE COURT: Yes.

JUROR NO. 8: My reason is like the Bible says, Do not throw the first stone, you know, if you have not sinned. And I hate to judge somebody and make a mistake. I do want to do what's right.

And in another way, I don't feel like I'm qualified to judge. Because I don't think I'm so educated enough on law and stuff to realize everything that's happened here.... I don't think I understand fully everything.

The judge responded that, "we're not going to press you ... because there are some things that a person feels that only that person feels." He noted that she had been "picked" by the attorneys, assured her that she was smart and educated enough to serve as a juror, and then went on:

THE COURT: Maybe I didn't ask you the right question, maybe. I don't know. I just simply didn't ask you the right questions that would have allowed you to come forth, but if you had, I would have asked you what I said right here: ... you're not unqualified. You're not uneducated. You tell me, do you have some belief? Do you have some feeling? Do you have some teachings?

JUROR NO. 8: My only—my only—like I say, not judging somebody, and in the Bible—and I feel like my religious teaching—I'm not that religious, but yet I feel that if I judge him or anyone else—I shouldn't judge, you know what I mean? That's my feeling.

THE COURT: Doesn't leave us in any—

JUROR NO. 8: If I have to do it, I have to do it. But I feel like, you know, it's just wrong, religiously.

THE COURT: Well—

JUROR NO. 8: I know what I feel, you know, but if I have to be a juror and have to do it, I can do it; but it's my feeling—that's why the other lady says she was so willing and wanted to do it. I said, Geez, why not change with her. She is so willing. She is—those are the only reasons she said.

THE COURT: Every alternate says, they go down and say, Why did you keep me here for two weeks if you're not going to use me?

I hope this hasn't made you uncomfortable.

JUROR NO. 8: It made me a little nervous.

THE COURT: We're trying to do the right thing for the system, and for which we're trying to do the right thing for everybody. So we had to talk to you. It was my decision to talk to you, not theirs. I may ask you to go back. I may not ask you to go back. I hope I haven't talked you into doing your duties by saying it the way I said. All I meant to say was, Don't feel that you cannot do your job. Maybe you need some more instruction. Maybe you want me—

JUROR NO. 8: I kind of feel like I can't—in my mind I know what I think, what my outcome would be, but I can't say it. You know, but yet sometimes it still goes back to the religious belief.

THE COURT: Let me talk to counsel for a minut [sic] please, okay? Would you just step out for a minute? Don't go too far.

After this colloquy, the court consulted with counsel. Defense counsel agreed that the juror should continue to serve. The court called in the entire jury and explained:

I'm sorry for the delay. A procedural matter came to my attention which had to be resolved. It does not affect your deliberations. It does not affect your continuing to deliberate as a jury. You should not ask, speculate, guess, consider in any way what this procedural matter was. Counsel and I have discussed it, and we are content to go forward with this jury as chosen by these counsel, because they are confident that the jury will view the evidence, listen to my instructions, and render a fair and impartial verdict regardless of the consequences which is your sworn duty.

The jury then continued to deliberate. Later that day, it found the defendant guilty.

In our view, the court's basis for calling in the juror for questioning (to examine a special problem of potential bias) was reasonable, for the court had adequate reason to believe that she had a special problem of potential bias that had not been disclosed during voir dire. The procedure followed was a fair and careful one, with both counsel present throughout. *See, e.g., United States v. Taylor*, 562 F.2d 1345, 1365–66 (2d Cir.) (emphasizing need for trial court to confer with counsel before communicating with juror and to report any communications immediately), *cert. denied*, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083 (1977); *United States v. Zeehandelaar*, 498 F.2d 352, 358 (2d Cir.1974) ("it is not improper for the trial court, in the exercise of its discretion, to interview individual members of a jury so long as counsel are present") (citing cases); *cf. United States v. United States Gypsum Co.*, 438 U.S. 422, 460, 98 S.Ct. 2864, 2885, 57 L.Ed.2d 854 (1978) ("Any *ex parte* meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error."). And, the questioning was reasonable and did not place the juror under improper pressure, subtle or otherwise, to reach a verdict, let alone a particular one. *Cf. United States v. Flannery*, 451 F.2d 880, 883–84 (1st Cir.1971) (discussing supplemental charge under *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157–58, 41 L.Ed. 528 (1896), urging jury to reach verdict). We can find no legal error.

## IV

### *Other Arguments*

Appellant Young makes a large number of other arguments, none of which raises any significant legal issue. We shall briefly indicate our reasons for rejecting each of them:

1. Young points out that the government initially indicted him on one count of embezzlement. 38 U.S.C. § 3501. After he moved to dismiss the charge (on the ground that the statute was unconstitutionally vague) the government brought a five count superseding indictment, in which it added four counts of mail fraud, 18 U.S.C. § 1341, based on Young's correspondence with the VA. Young claims that this amounts to vindictive prosecutorial behavior, and that the district court should have dismissed the superceding indictment or, at least, permitted Young to examine the grand jury minutes for evidence of vindictiveness.

■ Of course, a prosecutor may not behave vindictively. *See United States v. Marrapese*, 826 F.2d 145, 147 (1st Cir.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). But, the mere bringing of a new indictment with added counts is not in itself vindictive behavior, nor does it raise a presumption of vindictiveness sufficient to require investigation of grand jury minutes. *United States v. Goodwin*, 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982) (no presumption of vindictiveness where prosecutor brought four count felony indictment after defendant demanded jury trial on single misdemeanor count). Young's motion to dismiss the charge on the ground that the embezzlement statute was unconstitutional offers an obvious, and legitimate, reason why the prosecutor would want to add other, less controversial, charges to the indictment. *See id.* at 381, 102 S.Ct. at 2492–93 ("[d]efense counsel routinely file pretrial motions ... to, challenge the sufficiency and form of an indictment.... It is unrealistic to assume that a prosecutor's probable response to such motions" is vindictive); *cf. United States v. Krezdorn*, 718 F.2d 1360, 1365 (5th Cir.1983) (en banc) ("If any ... combination of events in those proceedings should indicate to a reasonable minded defendant that the prosecutor's decision to increase the severity of charges was motivated by some purpose other than a vindictive desire to deter or punish appeals, no presumption of vindictiveness is created."), *cert. denied*, 465 U.S. 1066, 104 S.Ct. 1416, 79 L.Ed.2d 742 (1984). Nothing in the record suggests any other motive. No access to the grand jury minutes was required. *See* Fed.R.Crim.P. 6(e)(3)(C)(ii).

■ 2. Young attacks his mail fraud convictions on the ground that the later mailings of letters and explanations to the VA had nothing to do with the earlier fraud, namely his lending the guardianship money to Tomar Farms. He is right that the mail fraud statute applies only to mailings that have to do with the fraud, 18 U.S.C. § 1341; *United States v. Maze*, 414 U.S. 395, 399–400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603 (1974); *United States v. Pietri Giraldi*, 864 F.2d 222, 224–25 (1st Cir.1988)

(per curiam), but his mailings to the VA have a proper connection, for they helped to conceal the fraud. *See United States v. Pacheco–Ortiz*, 889 F.2d 301, 305 (1st Cir. 1989) (per curiam) ("for the mailings to be considered 'in furtherance of the scheme, "the scheme's completion or the prevention of its detection must have depended in some way"' on the mailings") (citations omitted). Contrary to Young's contention, the mailings did not help to expose the fraud. The jury could readily find that the letters deliberately created false impressions in the mind of the reader, and they were therefore "part of the execution of the scheme as conceived ... at the time" they were written, even though they later may have returned "to haunt the perpetrator of the fraud." *Schmuck v. United States*, 489 U.S. 705, 715, 109 S.Ct. 1443, 1449–50, 103 L.Ed.2d 734 (1989).

■ 3. Young says that the government cannot prosecute him for both embezzlement and mail fraud, because, in his view, Congress' use of a "specific statute" to prohibit embezzlement "displaces" the "general" mail fraud statute; that is to say, Congress did not intend the two provisions to apply to the same conduct. Young relies on *Busic v. United States*, 446 U.S. 398, 406–08, 100 S.Ct. 1747, 1752–54, 64 L.Ed.2d 381 (1980), and *Simpson v. United States*, 435 U.S. 6, 15, 98 S.Ct. 909, 914, 55 L.Ed.2d 70 (1978), cases in which the Supreme Court held that Congress did not intend federal courts to apply a "sentence enhancement" contained in a general statute (enhancing the sentence when a firearm is used in commission of any felony), 18 U.S.C. § 924(c), and also to apply a certain, more specific "sentence enhancement" statute (enhancing the sentence when a firearm is used in the commission of a particular felony). We do not understand how these cases are relevant here.

■ We concede, of course, that specific statutory language, or special features of two statutes, or other circumstances, could show a Congressional intent not to permit conviction of a person under two statutes in respect to a specific event. But, there is no such intent evident here. The

The judgment of the district court is

*Affirmed.*