97 F.3d 1453
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert B. SMITH III, Defendant-Appellant.
 No. 95-6219.
 United States Court of Appeals, Sixth Circuit.
 Sept. 9, 1996.
 
 Before: SILER, MOORE, and COLE, Circuit Judges.
 SILER, Circuit Judge.
 
 
 1
 Defendant, Robert B. Smith III, appeals his conviction and sentence for embezzlement under 18 U.S.C. § 657. Smith raises several issues on appeal, including double jeopardy, discovery violations, sufficiency of the evidence, and application of the sentencing guidelines. This court AFFIRMS.
 
 
 2
 * Smith was president of Delta Mortgage Company ("Delta") in Jackson, Tennessee. Delta was authorized by the United States Department of Housing and Urban Development ("HUD") to process Federal Housing Administration ("FHA") residential loans under FHA's direct endorsement program. Delta was thus required to collect One-Time Mortgage Insurance Premiums ("OTMIPs") during the closing of FHA-insured loans and remit them to HUD.
 
 
 3
 In April 1992 HUD auditors and Thomas Luke, of the United States Office of the Inspector General, arrived at Delta to investigate whether Smith had embezzled or misapplied OTMIPs. The investigation found that the OTMIP checks were deposited into Delta's escrow account instead of being sent to HUD. The investigation unearthed over $75,000 in OTMIPs that were not paid by Delta. The government contends that Smith retained the OTMIPs for Delta's use and benefit. According to Helen Broyles, a HUD Division of Mortgagee Approval compliance officer, Smith had told her during this investigation that he had kept the OTMIPs to pay for Delta's utilities and rent.
 
 
 4
 Smith alleged that he discovered that the company had failed to remit the requisite OTMIPs. Consequently, on July 29, 1991, he executed a secured note of $51,169.66 to J.I. Kislak Mortgage Corporation ("Kislak"), for which Kislak was to cover the omitted OTMIPs. On September 3, 1991, Smith executed a similar note of $29,500 to the United States Mortgage Servicing Corporation ("USMSC"). Both Kislak and USMSC were among companies that had transacted to buy loans that Delta had processed.
 
 
 5
 Smith was indicted and convicted on several counts of embezzlement. He was sentenced to twenty-two months imprisonment and three years supervised release.
 
 II
 
 6
 Smith first argues that the criminal conviction violated his double jeopardy rights because he had been punished previously in an administrative civil proceeding. Following his indictment, Smith was barred by HUD from doing business with the United States government as a result of his failure to remit the OTMIPs, grounds that proved to be the basis of his criminal conviction. Smith argues that his conviction was subsequent punishment, placing him in double jeopardy.
 
 
 7
 The primary basis of Smith's argument rests on precedent that has since been overruled. See United States v. Ursery, 116 S.Ct. 2135 (1996) (holding that civil forfeitures are not punishments for double jeopardy purposes). In any case, the removal of Smith by HUD was a remedial penalty (protecting the public) and thereby not subject to the strictures of double jeopardy. See, e.g., DiCola v. Food & Drug Admin., 77 F.3d 504 (D.C.Cir.1996) (holding that order of FDA that debarred defendant from providing services to the pharmaceutical industry after he was convicted of adulterating a drug product did not violate double jeopardy); United States v. Bizzell, 921 F.2d 263 (10th Cir.1990) (ruling that penalty of disbarment from HUD activities is strictly remedial). "It is the clear intent of debarment to purge government programs of corrupt influences and to prevent improper dissipation of public funds. Removal of persons whose participation in those programs is detrimental to public purposes is remedial by definition." Bizzell, 921 F.2d at 267. The district court properly determined that Smith's double jeopardy rights were not violated.
 
 III
 
 8
 Smith argues that the evidence was insufficient to sustain his embezzlement conviction. This court must sustain the jury's determination so long as the conviction is supported by substantial evidence. United States v. Tilton, 714 F.2d 642, 645 (6th Cir.1983). The indictment charged that Smith, "acting as agent[ ] for [HUD] ... with the intent to injure and defraud [HUD], did knowingly and willfully embezzle and purloin a check made payable to [HUD] in violation of Title 18, United States Code, Section 657."
 
 
 9
 First, Smith claims that the government did not properly prove agency. Broyles testified that Delta was an "approved direct endorsement lender." She explained that a "direct endorsement lender is really an extension of HUD. They have the authority to originate and close FHA loans without any review by [HUD]. They do the full package." An employee with USMSC corroborated that Smith was an "authorized FHA-approved agent." Smith's actions on behalf of Delta substantially support the jury determination that he was a HUD agent.
 
 
 10
 Second, Smith argues that the government failed to prove that any embezzling occurred. "Embezzlement is 'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come.' " United States v. Holmes, 611 F.2d 329, 331 (10th Cir.1979) (quoting Moore v. United States, 160 U.S. 268, 269 (1895)). The parties stipulated that the checks at issue in this case were made out to HUD, forwarded to Delta, and deposited into Delta's "FHA Escrow Account." A Delta representative would then write checks on this trust account to HUD in the same amount, put photostatic copies of the checks in the files that would go to companies that had purchased the loans to indicate that the OTMIP had been paid, and void the checks. A letter by Smith indicated that when he "finally realized that a number of [OT]MIP checks were still in our files, and we didn't have enough cash in that account to cover them, I began to hold the [OT]MIP checks on new closings and then release an [OT]MIP for a similar amount on a previous closing." In and of itself, this letter is an admission that money that did not belong to Delta--which Delta held on behalf of HUD--was misappropriated.
 
 
 11
 Smith argues that the money was not used for personal benefit and therefore could not sustain the embezzlement charge. Smith admitted that money placed in the escrow account was withdrawn. Broyles testified that Smith told her that this money was used to cover business expenses. In essence, a clear inference could be made that Smith "fraudulently converted property entrusted to him by another" and used it for his own purposes. See United States v. Young, 955 F.2d 99, 103 (1st Cir.1992) (suggesting that embezzlement can take on a myriad of forms). This element of embezzlement was supported by substantial evidence.
 
 
 12
 Third, Smith argues that the government failed to prove that he intended to defraud and injure HUD. "[I]ntent to injure or defraud ... can be inferred from the facts and circumstances adduced at trial." United States v. Woods, 877 F.2d 477, 480 (6th Cir.1989). At trial, it was shown that Smith took checks made out to HUD and deposited them in Delta's escrow account. Smith conceded that at a later time, the escrow account could not cover the amounts deposited in that account. Smith told Broyles that the money was paid to cover business expenses. A jury could find that under such circumstances, the "irregularities" in the bookkeeping constituted an intent to defraud. At the very least, making photostatic copies of checks that were subsequently voided shows that affirmative action beyond mere negligence took place.[1] The jury could properly infer intent from the testimony at trial.
 
 
 13
 Finally, Smith argues that any embezzlement that did occur was not "willful." See United States v. Williams, 478 F.2d 369, 373 (4th Cir.1973) ("The government must show that the [embezzlement] acts were done willfully and intentionally, not by inadvertence or carelessness."). Specifically, Smith argues that he did not know he was violating the law. However, when he received a check, he deposited it into Delta's account, wrote a check to HUD, made a photostatic copy of it, sent it to the purchasers of the loan, and voided the check. Clearly, this evidence is sufficient for a jury to find that he acted willfully.
 
 
 14
 It does not strain credibility that a jury could conclude that Smith misdirected money, which belonged to HUD, to his own company. The jury could conclude that Smith acted fraudulently because he "covered his tracks" by making photostatic copies of checks that were to be voided. Even if Smith's intent was to pay this money back, as evidenced by his letters, the misappropriation is enough to constitute a criminal violation. See Young, 955 F.2d at 104. Smith has not met his "heavy burden" that the evidence was insufficient to sustain his guilty verdict. See United States v. Vannerson, 786 F.2d 221, 225 (6th Cir.), cert. denied, 476 U.S. 1123 (1986).
 
 IV
 
 15
 Smith alleged that discovery violations denied him a fair trial. Broyles had written a statement of her conversations with Smith that occurred during her investigation and sent the statement to "archives in Washington," where it was lost in the netherworld of the federal bureaucracy. Under Federal Rule of Criminal Procedure 16 and the Jencks law, 18 U.S.C. § 3500, Smith was entitled to this statement. He alleges that the failure to produce this statement was prejudicial in that it could have been used to impeach her or Luke and might have affected Smith's plea. See United States v. Meisch, 370 F.2d 768, 772 (3d Cir.1966) (noting that statements have an impeachment function and an informational function). Thus, he contends that the district court erred in not awarding him a new trial or a mistrial.
 
 
 16
 A district court's treatment of a failure to disclose a statement to the defendant under Rule 16 is reviewed for abuse of discretion. United States v. Glover, 846 F.2d 339, 342 (6th Cir.), cert. denied, 488 U.S. 982 (1988). The district court ruled that
 
 
 17
 [t]he witness took a statement from the defendant. This witness reduced that statement to writing. That written statement should have been produced to the defendant. But if it has not, then the remedy for that failure to produce is that this witness cannot testify about anything in this statement that was not disclosed.
 
 
 18
 A harsher remedy was not warranted. Smith was able to question Broyles outside the presence of the jury. See United States v. Bartle, 835 F.2d 646, 650 (6th Cir.1987) (noting that a recess or continuation can often cure the failure to disclose), cert. denied, 485 U.S. 969 (1988). Smith was able to use her testimony to impeach Luke. Any evidence submitted outside of Luke's narrative was initiated by Smith. The district court did not abuse its discretion.
 
 V
 
 19
 Smith's final argument relates to the district court's application of the Sentencing Guidelines to his sentence. Smith argues that because there was no loss, he should have received a base offense level of four. The presentence report added an eight-level increase for a loss of more than $70,000. See USSG § 2B1.1(b)(1)(I). The district court reduced the loss to $61,000, a seven-level increase, because Smith had paid some of the money that was embezzled.
 
 
 20
 The crux of Smith's argument appears to be that his crime--embezzling money as a HUD agent--produced no HUD losses. The OTMIPs had been paid, albeit late, by the mortgage purchasers. Thus, according to Smith, HUD suffered "delays" rather than "losses."
 
 
 21
 There was sufficient testimony concerning the dollar amount of the mortgage insurance premiums that were not paid by Delta. " 'Loss' means the value of the property taken." USSG § 2B1.1, comment. (n. 2). Smith does not assert that he paid back the full amount of the OTMIPs that he deposited. He does not contest the amount of money that was taken. The guidelines focus on the amount taken rather than the amount suffered. The district court did not misapply the sentence. Smith's arguments relating to sentencing are without merit.
 
 
 22
 AFFIRMED.
 
 
 
 [1]
 Other circumstances also evidence intent. A USMSC employee testified that Smith did not respond to her inquiries about the missing OTMIPs until she threatened to contact the FHA. See Young, 955 F.2d at 103-04 (noting that delays in responding to inquiries could evidence knowledge that one was fraudulently converting money). Moreover, Smith's letter to USMSC certainly leads one to the conclusion that he knew about problems and tried to manipulate the situation to stay in business:
 After discovering what a mess I had blundered into about a year ago, I have lived in fear of the consequences. I am an extremely knowledgeable financial person, and I am very aware of the precarious position in which I find myself.... I have lived in fear, frustration and terror for the last year by not knowing if your firm would work with me. It is my opinion that if you will work with me, everyone will be satisfied.