Filed 10/16/13  P. v. Combs CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GENE ALLEN COMBS,<br><br>    Defendant and Appellant. | A130068<br><br>(Solano County<br>Super. Ct. No. FCR259239)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT[1]:

The opinion filed September 27, 2013, is hereby modified as follows:

1.  On page 13, footnote 7 should be modified to read as follows:

    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  The basis for the motion was actually that defendant's statements were involuntary because before he received *Miranda* admonitions, police allegedly told him anything he said was off the record.

---

[1]  Before Margulies, Acting P. J., Dondero, J. and Banke, J.

Defendant's petition for rehearing is hereby denied.

There is no change in judgment.


Dated: _____          _____

Margulies, Acting P. J.

Filed 9/27/13 (unmodified version)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. GENE ALLEN COMBS, Defendant and Appellant. | A130068 (Solano County Super. Ct. No. FCR259239) |

Defendant Gene Allen Combs was convicted of second degree murder as an aider and abettor of the killing of Fairfield city councilman Matt Garcia by Henry Don Williams. He contends insufficient evidence supported the verdict, the jury was improperly instructed, and the trial court erred in denying his motions for change of venue, judgment of acquittal and change of attorney. He also maintains the court erred in commenting on the evidence, and that cumulative errors require reversal. We conclude there was no prejudicial error, and affirm.

## BACKGROUND

Defendant was friends with Williams,[1] and the latter introduced him to his cocaine and methamphetamine dealer Ryan Estes, who lived on Silverado Drive in Fairfield.

Around 3:30 p.m. on Labor Day, 2008, defendant called Estes and asked to buy methamphetamine. The men met about 20 minutes later, and defendant gave Estes $50 to obtain the drugs. When Estes failed to show up an hour later as agreed, defendant called

---

[1] Williams was tried separately and convicted of first degree murder. His conviction was affirmed in case No. A130138.

Estes and sounded "a little irritated." Estes told him it would take another hour. Estes did not obtain the drugs, but instead bought beer and went to a party.

Around 7:00 p.m., defendant called Williams and told him "he had been ripped off by his buddy for 50 bucks." Williams told him Estes was at home, but there were "a couple of guys there" and he "shouldn't go alone." Defendant was intimidated by Estes because he was "a big guy." The two made plans to meet at a Popeye's Chicken and then go together to Estes's house. Defendant met Williams at the restaurant and got in the back seat of his car. Nicole Stewart, Williams's pregnant girlfriend, was driving. Williams told defendant that Estes had recently "shorted" him on a bag of drugs, "[s]o [Williams] was upset also." They agreed to go to Estes's house and "confront him."

Defendant was "pissed" and continued to call Estes on the way to his house. Stewart parked the car across the street from Estes's house. Williams went to the door, carrying a black box Stewart had seen before "around the house." Williams returned to the car after talking with Estes's sister, and indicated Estes was not at home. Defendant said " 'Well, we'll catch him later.' "

Stewart drove down Silverado Drive and stopped at a stop sign. A car approached, and defendant and Williams "were wondering" whether Estes might be in it. Defendant said the car had turned around in front of Estes's house, and had flashed its lights. Defendant and Williams "were still talking back and forth if it could be [Estes]." Both men were still upset and angry. Williams told Stewart to pull over, and got out of the car, while defendant remained inside. Stewart then heard three popping sounds from behind her. Williams returned and defendant told her to start the car.

Williams got back in the car, holding his shirt in his hands. He was using the shirt to rub something, which Stewart thought was a gun. Defendant told him to "put it somewhere in the front of the car" by the motor, because it "cleans off the fingerprints," but Williams said he was going to throw it in the bushes.

Williams told Stewart to drive them to his mother's house. When they arrived, Williams went instead to the house of Francisco Perez, a neighbor. Defendant got in the front seat of the car, and Stewart drove him back to his car, which he had left at Popeye's.

2

Williams gave the gun and his shirt to Perez and asked him to "dispose of the gun." Perez threw it "into the water" by the Benicia Bridge.

Defendant first learned someone had been killed on Silverado Drive the next morning when he was watching the news. Matt Garcia, a Fairfield city councilman, died after being shot in front of a friend's house on Silverado Drive. It "dawned on [defendant] . . . 'Oh, wait a minute . . . we were out there last night.' " Defendant told a friend he thought Williams "shot that councilman last night."

Defendant contacted the police about a week and a half later, telling them "I know who shot the councilman. I was with that person who did it." He told district attorney investigator Kurtis Cardwell he was "[a]ngry, frustrated, upset [and] pissed off" about being "ripped off" by Estes. Defendant admitted leaving Estes phone messages in which he cursed at Estes and threatened to burn his house and car down. He also left Estes a message around 10:30 p.m. on Labor Day stating " '[t]hose bullets down the street, nigga, were meant for you.' "

Defendant also told Caldwell he had "brokered a deal [for Williams] to purchase a gun" weeks before the murder. Defendant testified he drove with Williams to purchase the gun because defendant knew the seller but Williams did not. When they arrived, Williams gave defendant the money for the gun, and defendant went inside the seller's house while Williams waited in the vehicle. Defendant gave the money to the seller and took the gun back to Williams. He asked Williams, " 'How do you know that thing even works?' " and Williams pointed it at him and said " 'How about I try it on you?' " Defendant felt "uncomfortable" and told him he was going to walk home. Defendant agreed Williams "had a . . . propensity to want to point that gun at somebody."

Defendant told Cardwell "he knew Henry Williams had a gun . . . when . . . Williams was walking up to Estes'[s] house in Cordelia that night." Defendant testified, however, he was lying when he told police Williams went to Estes's front door with a black box, a bag, or what could have been a gun because he "was under the impression [he] was going to be released for cooperating with the police." He testified the next time

he saw the gun after its purchase was "when Mr. Williams had got into the car after the shooting."

A jury convicted defendant of second degree murder.

DISCUSSION

*Substantial Evidence*

The prosecutor argued defendant aided and abetted Williams in committing three target offenses—attempted extortion, brandishing a firearm and assault with a deadly weapon—and the murder was a natural and probable consequence of any of those offenses. Defendant maintains there was no substantial evidence he aided and abetted any of those offenses.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Bolden* (2002) 29 Cal.4th 515, 553.) " 'The standard of review is the same in cases in which the People rely mainly on circumstantial evidence. [Citation.] "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citations.]' [Citations.] The conviction shall stand 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." ' [Citation.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507–508.)

" '[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by

4

act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.] Furthermore, under the ' "natural and probable consequences" ' doctrine, an aider and abettor is guilty not only of the offense he or she intended to facilitate or encourage, but also any reasonably foreseeable offense committed by the person he or she aids and abets. [Citation.]" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295–296.)

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]" [Citation.] Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a *reasonably* foreseeable consequence of the act aided and abetted." [Citation.]' [Citations.] A reasonably foreseeable consequence is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case." (*People v. Favor* (2012) 54 Cal.4th 868, 874.)

"Aider and abettor culpability under the natural and probable consequences doctrine for a nontarget, or unintended, offense committed in the course of committing a target offense has a different theoretical underpinning than aiding and abetting a target crime. Aider and abettor culpability for the target offense is based upon the intent of the aider and abettor to assist the direct perpetrator commit the target offense. By its very nature, aider and abettor culpability under the natural and probable consequences doctrine is not premised upon the intention of the aider and abettor to commit the nontarget offense because the nontarget offense was not intended at all. It imposes vicarious liability for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. (*People v. Garrison* (1989) 47 Cal.3d 746, 778 . . . [accomplice liability is vicarious].) Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability

5

is imposed simply because a reasonable person could have foreseen the commission of the nontarget crime." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 852.) "[I]n determining whether a collateral criminal offense was reasonably foreseeable to a participant in a criminal endeavor, consideration is not restricted to the circumstances prevailing prior to or at the commencement of the endeavor, but must include all of the circumstances leading up to the last act by which the participant directly or indirectly aided or encouraged the principal actor in the commission of the crime." (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 532.)

Defendant concedes he committed one of the target offenses, the crime of attempted extortion, either by telephoning Estes and threatening to burn down his home and car if his money was not returned, or by aiding and abetting Williams when he went to Estes's house. He claims, however, he "could not be guilty of murder under a natural and probable consequence theory because the shooting did not occur during the commission of the attempted extortion," relying on *People v. Cooper* (1991) 53 Cal.3d 1158 (*Cooper*).

*Cooper* is inapposite because it did not consider the natural and probable consequences doctrine. The issue in *Cooper* was whether the defendant could be guilty of aiding and abetting a robbery if the jury determined he "did not form the requisite intent to facilitate or encourage commission of the robbery prior to the robbers' flight with the stolen property." (*Cooper*, *supra*, 53 Cal.3d at p. 1160.) *Cooper* did not address the issue of whether a non-target offense can only be a natural and probable consequence of the target offense if it is committed during commission of the target offense. Indeed, a "defendant may be convicted under the natural and probable consequences doctrine even if the target criminal act . . . was not committed." (*People v. Ayala* (2010) 181 Cal.App.4th 1440, 1443 (*Ayala*).)

In *Ayala*, the defendant was convicted of second degree murder under the natural and probable consequences theory of aiding and abetting an assault. (*Ayala*, *supra*, 181 Cal.App.4th at p. 1443.) The defendant was driving a carload of his fellow gang members when they passed a group of men they perceived to be rival gang members. (*Id.*

6

at p. 1444.)  The car occupants asked defendant to drive by again, and he knew " 'there was gonna be some . . . gang related ass shit.' " (*Id*. at p. 1445.)  The defendant knew there was a baseball bat in the car, and thought the car occupants were going to beat the men with it.  (*Ibid*.)  Instead, one of them got out of the car with a gun and shot the victim.  (*Ibid*.)  The court held the fatal shooting was "a natural and probable consequence of a planned physical attack by multiple gang members upon perceived rival gang members even though the shooting occurred at the start of the confrontation and no assault . . . preceded the shooting. . . .  An aider and abettor may be liable where he intentionally aids one criminal act but the perpetrator actually commits some other, more serious criminal act that is reasonably foreseeable." (*Id*. at p. 1443.)

The court in *People v. Medina* (2009) 46 Cal.4th 913 (*Medina*) considered a situation comparable to that demonstrated by the evidence here.  In *Medina*, the defendant and two fellow gang members "challenged" a member of another gang and then engaged in a fistfight.  (*Id*. at pp. 917, 922.)  After the fistfight ended, someone yelled "get the heat" (meaning a gun), and the defendant shot and killed the victim as he was driving away from the scene of the fight.  (*Id*. at p. 917.)  The Supreme Court reversed the Court of Appeal, which had concluded there was insufficient evidence the nontarget offense was a natural and probable consequence of the target offense of simple assault because "the shooting occurred after the fistfight had ended." (*Id*. at pp. 916, 922.)  Explaining " 'the ultimate factual question is one of foreseeability,' " the court held "the evidence shows there was a close connection between the failed assault against [the victim] . . . and the murder of [the victim] . . . and the shooting and death were ' "not an unreasonable result to be expected from the [assault]." ' [Citation.]" (*Id*. at pp. 920, 925.)

The evidence here similarly showed a close connection between the target and non-target offenses.  Defendant knew Williams owned a gun and had a propensity to use it prior to calling him to get his help in getting money or drugs from Estes.  Defendant was intimidated by Estes, and Williams told him not to go to Estes's house alone. Defendant told police he believed Williams had a gun when he was walking up to Estes's

7

house.  When Williams returned to the car after speaking with someone at Estes's house and learning he was not there, defendant said " 'Well, we'll catch him later.' "  Minutes later, as they drove away from Estes's home, defendant and Williams had a discussion about whether Estes was in a car that drove by and flashed its lights.  They pulled over, and Williams exited the car and shot Garcia, thinking he was Estes.  There was substantial evidence from which the jury could conclude the killing of a man thought to be Estes was a reasonably foreseeable result of the admitted attempted extortion[2] of Estes minutes earlier on the same street. [3]

### *Jury Instructions*

#### *CALCRIM No. 1830*

The court instructed the jury with CALCRIM No. 1830 on the elements of extortion, but did not instruct with CALCRIM No. 460 on the meaning of attempt in relation to the target offense of extortion.[4]  Defendant failed to request such instruction, but claims any error was not forfeited because the lack of instruction deprived him of due process.

However, the meaning of "attempt" is one the jury could readily understand without specific instruction.  Indeed, the California Supreme Court has held the instruction on attempt with respect to attempted robbery, CALJIC No. 6.00, " 'merely restates the common meaning of "attempt," ' which is 'to "try" or "endeavor to do or perform" the act.'  [Citation.]"  (*People v. Lynch* (2010) 50 Cal.4th 693, 763 (*Lynch*);

---

[2]  Given our conclusion there was substantial evidence of attempted extortion, we need not and do not reach the issue of whether there was also substantial evidence of assault and brandishing.

[3]  Defendant claims his conviction must be reversed because "there is no way of knowing upon which theory of criminal liability the jury decided the case, the attempted extortion theory, the assault theory, or the brandishing theory," relying on *People v. Guiton* (1993) 4 Cal.4th 1116, 1122, 1129–1130 (*Guiton*).  *Guiton* is inapposite, because the jury was tasked with the factual determination of whether any one of the three target offenses were committed, and was not required to agree unanimously on the target offense.  (*People v. Santamaria* (1994) 8 Cal.4th 903, 918–919.)  "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.  But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, . . . the . . . rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, *supra*, at p. 1129.)

[4]  The jury instruction was titled "Attempted Extortion By Threat Or Force (Pen. Code § 524)," but did not define "attempt."

overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643.)

Further, defendant has demonstrated no prejudice or violation of due process, given his

concession he "committed the crime of attempted extortion."[5]

### *CALCRIM No. 400*

Defendant also asserts the trial court erred in instructing the jury with an outdated

version of CALCRIM No. 400, which included the statement an aider and abettor is

"equally guilty of the crime."  To begin with, defendant failed to object.  "[T]o the extent

[defendant] believed that the instruction was inaccurate in the facts presented in this case,

he was obliged to object to it or to request clarification or modification, which he failed

to do. He has therefore forfeited his claim as to CALCRIM No. 400."  (*People v.*

*Canizalez, supra*, 197 Cal.App.4th at p. 849.)

Further, while the language of which defendant complains was removed in the

2011 version of the instruction (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1119,

fn. 5), "the statement in CALCRIM No. 400 that an aider and abettor is 'equally guilty'

with the direct perpetrator of the target crime 'is generally an accurate statement of law.'

[Citation.]"  (*People v. Canizalez, supra,* 197 Cal.App.4th at p. 849.)  "If the jury found

either appellant guilty only as an aider and abettor under the natural and probable

consequence doctrine, the "equally guilty" statement is also correct."  (*Id*. at p. 850.)

Accordingly, there was no error in connection with giving of this instruction.

### *CALCRIM No. 401*

As we have recounted, after learning Estes was not at home on the night of the

murder, defendant said to Williams:  "That's okay.  We will catch him later."  Claiming

his statement to Williams constituted withdrawal from the crime of attempted extortion,

defendant contends the trial court had a sua sponte duty to instruct with the portion of

CALCRIM No. 401 on withdrawal, a defense to aiding and abetting, and failure to do so

violated his due process rights.

---

[5]  His claim in regard to attempted extortion is that the court failed to provide the jury with guidance as to when the attempted extortion was complete, not that an attempt did not occur.

In order for that defense to apply: "(1) the aider and abettor must notify everyone else he knows is involved in the commission of the crime that he is no longer participating and (2) that notification must be made early enough to prevent the commission of the crime." (*People v. Battle* (2011) 198 Cal.App.4th 50, 67.)

Defendant's statement they would "catch" Estes later was neither a notification defendant was no longer participating in the attempted extortion, nor made early enough to prevent commission of the crime. In fact, the statement suggested the attempted extortion was continuing. And, defendant's telephone message to Estes about an hour after the murder that "those bullets were meant for you" further indicated defendant had not withdrawn, but was continuing to pursue the attempted extortion. There was, in sum, no substantial evidence of withdrawal. The trial court therefore had no sua sponte duty to instruct on that defense, (*People v. Fiu* (2008) 165 Cal.App.4th 360, 383) and the lack of such instruction did not violate defendant's due process rights. (*People v. Jenkins* (2000) 22 Cal.4th 900, 986.)

### *Failure to Instruct on Manslaughter*

Defendant also contends the trial court erred in not instructing, sua sponte, on manslaughter, claiming "[w]ithout instructions on lesser included offenses the jury could not determine which, if any, of Williams's acts were reasonably foreseeable to [him] . . . ." A conviction for murder requires the commission of an act that causes death, done with the mental state of malice aforethought, either express or implied. (§§ 187, 188.) "Express malice is an intent to kill. [Citation.] Implied malice does not require an intent to kill. Malice is implied when a person willfully does an act, the natural and probable consequences of which are dangerous to human life, and the person knowingly acts with conscious disregard for the danger to life that the act poses." (*People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)

Sua sponte instruction on a lesser included offense is required only if "there is substantial evidence, that, if accepted, would absolve the defendant from guilt of the greater offense but not the lesser." (*People v. Waidla* (2000) 22 Cal.4th 690, 737.) Williams fired multiple gunshots at Garcia, either intending to kill the man he thought

was Estes, or intentionally shooting him, the natural and probable consequences of which were dangerous to human life. There was no evidence suggesting a mental state that did not include express or implied malice. Accordingly, there was no sua sponte duty to instruct on that defense, (*People v. Fiu, supra*, 165 Cal.App.4th at p. 383) and the lack of such instruction did not violate defendant's due process rights. (*People v. Jenkins, supra,* 22 Cal.4th at p. 986.)

## *Denial of Motion for Acquittal*

Defendant maintains the trial court also erred in denying his motion for acquittal under section 1118.1 because there was no substantial evidence he knew Williams had a gun, and Williams's shooting of Garcia took place after the attempted extortion had "already been completed." As we have already discussed, substantial evidence supports defendant's conviction for aiding and abetting. Accordingly, defendant's motion was properly denied.

## *Court's Comments on the Evidence*

The court stated to the jury, prior to the prosecutor's cross-examination of defendant, "I will anticipate the People will have cross-examination of Mr. Combs. And there may be some Redirect and Recross. And then I think that is going to be the evidence in the case, which for the most part is pretty uncontroverted." Defendant claims the "pretty uncontroverted" statement constituted improper comment on the evidence, usurping the "jury's factfinding prerogative" and conveying the court's "belief that [defendant] was guilty." (Italics omitted.)

"A trial court is constitutionally empowered to make, in its discretion, '[such] comment on the evidence and testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause.' (Cal. Const., art. VI, § 10.)" (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885.) " ' "The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." ' " [Citations.] Thus, a trial court has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.' [Citation.]" (*People*

11

*v. Monterroso* (2004) 34 Cal.4th 743, 780.)  "[A]ppellate courts still must evaluate the propriety of judicial comment on a case-by-case basis, noting whether the peculiar content and circumstances of the court's remarks deprived the accused of his right to trial by jury."  (*People v. Rodriguez* (1986) 42 Cal.3d 730, 770.)

The trial court correctly noted the underlying facts of the murder were essentially uncontroverted, and defendant acknowledges as much.  ("[T]he broad outlines of the case may have [been] uncontroverted.")  The issue was primarily the significance of certain facts, such as whether it was reasonably foreseeable the attempted extortion of Estes might lead to Williams shooting a person he thought was Estes.  Moreover, the court instructed the jury not to "take anything I say or do during the trial as an indication of what I think about the facts, the witnesses, or what your verdict should be. . . ."  It further instructed the jury it was to "decide what the facts are in this case" and the jury "alone must judge the credibility or the believability of the witnesses."  In sum, there was no improper comment on the evidence that deprived defendant of his right to trial by jury.

### *Denial of* **Marsden** *Motion*

After the jury verdict, defendant filed a *Marsden*[6] motion.  He claimed his counsel was ineffective because, although he had filed a motion to exclude defendant's statement to the police, it was on grounds other than those defendant had suggested.  We review the court's denial of the motion for abuse of discretion.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085 (*Barnett*).)

" ' " 'A defendant is entitled to . . . [new appointed counsel] if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations.]" ' [Citation.]" (*Barnett, supra,* 17 Cal.4th at p. 1085.)  "[T]he standard expressed in *Marsden* and its progeny applies equally preconviction and postconviction." (*People v. Smith* (1993) 6 Cal.4th 684, 694.)

---

[6]  *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

At the *Marsden* hearing, defendant asserted his counsel "refused to follow [his] express wishes . . . [he] refused to investigate or file a motion on . . . an implied promise of leniency that was made . . . that could have made my statements at the September 14th, 15th and 17th, 2008 [police] interviews possibly involuntary and inadmissible in Court." Defendant's counsel explained he filed a motion to suppress defendant's statements to the police "as involuntary, and based on *Miranda* as well.[7] [¶] . . . [¶] I did not raise this specific issue. Mr. Combs informed me of this. I did the research on promises of leniency. The cases on promises of leniency really require, from my reading of them, more than this, you know. There was nothing in this indicat[ing] that the DA was involved in this . . . it wasn't on the videotape itself, although there were ways we could potentially have gone around that, but . . . I tried to get the statement thrown out, but the focus of my motion was primarily on Mr. Combs' repeated requests, which I believe, to invoke his right to silence and his right to counsel."

Defendant's counsel explained his reasonable tactical decision to move to suppress defendant's statements on the grounds counsel felt most appropriate. Reasonable tactical decisions do not constitute ineffective representation. (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.) Moreover, substitute counsel is not required unless the conflicts between attorney and client are "of such magnitude as to substantially impair defendant's right to the assistance of counsel." (*People v. Williams* (1970) 2 Cal.3d 894, 905.) There was no such evidence here. Accordingly, the trial court did not abuse its discretion in denying the motion.

***Motion to Change Venue***

Defendant also claims the trial court erred in denying his motion for change of venue and, specifically, by not allowing expert testimony about a survey conducted of Solano County residents about their awareness of the crime.

---

[7] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). The basis for the motion was actually that defendant's statements were involuntary because after he received *Miranda* admonitions, police allegedly told him anything he said was off the record.

13

"The court shall order a change of venue:  [¶] . . . when it appears that there is a reasonable likelihood that a fair and impartial trial cannot be had in the county. . . ."  (Pen. Code, § 1033, subd. (a).)  The court considers five factors in making that determination: " ' "(1) nature and gravity of the offense; (2) nature and extent of the media coverage; (3) size of the community; (4) community status of the defendant; and (5) prominence of the victim." ' "  (*People v. Farley* (2009) 46 Cal.4th 1053, 1082 (*Farley*).)  " ' "We will sustain the court's determination of the relevant facts where supported by substantial evidence.  We independently review the court's ultimate determination of the reasonable likelihood of an unfair trial." '  [Citation.]"  (*Ibid*.)

Defendant sought to present expert testimony about the results of a survey which showed 90.5 percent of surveyed Solano residents had heard about the murder. He maintains expert testimony was necessary so the court would know "how to interpret the numbers and would 'know' what the numbers meant."  Defendant cites no authority requiring an evidentiary hearing on a change of venue motion, which in general is held only if "necessary to resolve material, disputed issues of fact."  (*People v. Hedgecock* (1990) 51 Cal.3d 395, 415.)  Furthermore, the trial court not only considered the expert's report, it accepted "what Dr. Bronson says.  I accept it on face value. . . .  I'm not . . . challenging his survey in any way, shape or form.  I accept what he has presented."

" 'The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant.'  (*Patton v. Yount* (1984) 467 U.S. 1025, 1035 . . . .)  "We must distinguish between mere familiarity with [the defendant] or his past and an actual predisposition against him.'  [Citation.]  . . .  ' "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." ' . . ."  (*Farley, supra,* 46 Cal.4th at p. 1086.)  Thus, the California Supreme Court has upheld denials of change of venue motions in cases where the vast majority of prospective jurors had heard about the case. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 432–433, 435 (94.3%); *People v. Proctor* (1992) 4 Cal.4th 499, 524–526 (80%); *People v. Bonin* (1988) 46 Cal.3d 659, 675–677 (85%), overruled on another

14

ground as stated in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  "[T]here is no requirement that jurors be totally ignorant of the facts of a case, as long as they can lay aside their impressions and render an impartial verdict."  (*People v. Lewis* (2008) 43 Cal.4th 415, 450.)

Defendant asserts the first change of venue factor, the nature and the gravity of the offense, "weighed in favor" of a change of venue because it was a murder of "a person of high importance" and "involved a sense of sensationalism."  Murder is always a grave offense, but "the same could be said . . . of most capital crimes, and . . . this factor is not dispositive."  (*Farley, supra*, 46 Cal.4th at p. 1083.)  "Indeed, on numerous occasions we have upheld the denial of change of venue motions in cases involving multiple murders."  (*Ibid.*)  The trial court concluded this factor did not favor a change of venue, noting there were no sexual or racial overtones, it was not a capital case, nor were there serial murders.  And, while the murder in this case was of an elected official, that fact does not change the nature of the killing for the purposes of venue analysis.  Garcia was murdered in a case of mistaken identity, not targeted because he was a city councilman.

Defendant also maintains the extensive publicity about the murder mandated a change of venue.  He notes there were "695 newspaper articles related to the case," which indicated Garcia was killed "because of mistaken identification and a drug deal gone bad . . . and that his killing was an 'attack on democracy.' "  While the news coverage was extensive, the vast majority of the articles in the record were "largely factual" rather than inflammatory, a factor the court may consider.  (*Farley, supra,* 46 Cal.4th at p. 1083.)  Indeed, defendant does not identify any of the 692 articles in Exhibit A as being inflammatory.  The bulk of the newspaper articles mentioning Garcia were about the youth center and scholarship fund bearing his name, and were unrelated to the trial.  As the court found, "most of the press within the last year is press about the youth center or the Matt Garcia Foundation, which is talking about keeping Mr. Garcia's dream alive, having events for youth."  The court further found "the overwhelming majority of the press is fairly neutral and factual," and noted "the majority of the critical press . . . was

15

more critical of the District Attorney's . . . decision to provide immunity to . . . the driver in this case . . . ."

Defendant also contends Solano County is "neither a large nor a small county" where the "prospective juror pool was rather limited." (Fn. omitted.) "[M]otions to change venue have been granted where the county is relatively isolated and small. (See, e.g., *Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 582 . . . [Placer County, population 106,500]; *People* v. *Tidwell* (1970) 3 Cal.3d 62, 64 . . . [Lassen County, population 17,500].)" (*People v. Webb* (1993) 6 Cal.4th 494, 514.) Solano County is not isolated, but "bisected by the heavily traveled Interstate 80 corridor between San Francisco and Sacramento, is no more than 45 miles from either of these large urban areas." (*Bello v. ABA Energy Corp.* (2004) 121 Cal.App.4th 301, 313, fn. 3.) Nor is it small: the population at the time was over 400,000. (*Ibid.*)

Defendant next asserts his status in the community militated in favor of changing venue because he was "portrayed in an unflattering manner." A change of venue may be necessary where the defendant is "associated with an organization or group which aroused community hostility. [Citations.]" (*People v. Ainsworth* (1988) 45 Cal.3d 984, 1002.) There is no evidence defendant was a member of "an unusual subcultural or unpopular group." (*Frazier v. Superior Court* (1971) 5 Cal.3d 287, 290, 293–295 (defendant was a "hippie" and county felt deep-seated antagonism toward such individuals); *People v. McKee* (1968) 265 Cal.App.2d 53, 59 [defendant was associated with Hell's Angels group].) The court found Combs was an African-American man "in a community that is very diverse, and there does not appear to be anything about [his] status which would promote any sort of hostility." Indeed, the trial court found there was "hardly any [press] on Mr. Combs."

Defendant also contends Garcia's prominence was a significant factor. He claims Garcia, was "a person of high importance, the youngest councilman in Fairfield history." As an elected official, Garcia had some prominence in Fairfield at the time of his murder. The court found, however, he "was a fairly newly-elected City of Fairfield City Councilman." There was no evidence he was well-known throughout all of Solano

16

County, or that, as defendant claims, Garcia "attained the status of celebrity while living." As the court found, "I think it is fair to say that [Garcia] has had a greater impact posthumously than he has before his passing, . . . he was a young man; he did not have perhaps the time to have a greater impact on the community. . . ."

In sum, there is no merit to defendant's challenge to the denial of his venue motion. Substantial evidence supports the trial court's factual findings, and our independent review of the record demonstrates defendant did not meet his burden of establishing a reasonable likelihood he could not receive a fair and impartial trial in Solano County.[8]

## DISPOSITION

The judgment is affirmed.

_____
Banke, J.

We concur:

_____
Margulies, Acting P. J.

_____
Dondero, J.

---

[8] " 'We have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236.)

17